(No. 13946.—Reversed and remanded.)
HANNAH F. WRIGHT, Appellee, *vs.* ALBERT UPSON *et al.*
Appellants.

*Opinion filed April 19, 1922.*

1. WILLS—*when former will is admissible to sustain contested will.* For a former will or declarations of a testatrix to be admissible to show that she was of sound mind and memory at the time of the execution of a contested will, such declarations and the provisions of such will must be in substantial conformity with the provisions of the contested will and be made when the testatrix is conceded to have been of sound mind and memory.

2. SAME—*evidence tending to blacken reputation of testatrix is not admissible on issue of mental capacity.* Evidence tending to blacken the reputation of the testatrix for honesty and fair dealing and to prejudice the jury against her is not admissible on the issue of mental capacity in a will contest, and such evidence cannot be made the basis of hypothetical questions put to expert witnesses.

3. SAME—*what instructions in will contest are improper.* In a will contest, instructions that if the testatrix was incapable of knowing the natural objects of her bounty the jury should find that she was incompetent to make a will are improper, where there is no evidence that she did not know the natural objects of her bounty; nor should the court give a long and involved instruction to the effect that to have sufficient capacity to make a will the testatrix must have had the power to retain in her mind all the elements of the transaction for a sufficient time to form a rational judgment.

4. SAME—*when hospital records are admissible on issue of patient's mental capacity to make will.* In a will contest case, the records of a hospital where the testatrix was a patient during her last illness, a few months after she had executed her will, and where she executed a codicil, are admissible on the issue of mental capacity only after proof of their correctness as books of account; but nurses who made the records may refresh their recollection from their own notes and testify as to the mental and physical condition of the testatrix.

5. SAME—*court must see that guardian ad litem makes proper defense.* In a will contest case it is the duty of the guardian *ad litem* appointed to represent infant defendants to make only a proper defense and to incur no unnecessary expenses in making the same, and it is the duty of the court to see that no unnecessary or improper defense is interposed and that the interests of the infants are protected.

6. SAME—*reasonable guardian ad litem's fee may be taxed as costs in contest case.* In a will contest case, a guardian *ad litem* appointed to represent infant defendants is entitled to a reasonable fee for making a reasonable and necessary defense, and it is proper to tax such fee as costs against the estate.

7. SAME—*how fees of guardian ad litem should be determined.* In a will contest case the fee of a guardian *ad litem* appointed to represent infant defendants should be fixed by the testimony of attorneys as to what is a customary fee for the same services in cases wherein the fee is the subject of contract between the solicitor and a client, but the court is not bound by the testimony of the attorneys as to what is a proper fee if it appears to be unreasonable.

APPEAL from the Circuit Court of Fulton county; the Hon. G. O. DIETZ, Judge, presiding.

ROBERT C. WOOLSEY, CHARLES J. SCOFIELD, and HARVEY H. ATHERTON, guardian *ad litem*, for appellants.

BURNETT M. CHIPERFIELD, and CLAUDE E. CHIPERFIELD, for appellee.

Mr. JUSTICE DUNCAN delivered the opinion of the court:

Hannah F. Wright, appellee, filed her bill in the circuit court of Fulton county against Albert Upson, Sarah M. Hummel, Martha L. Taylor, Sarah Burnhart, George Upson, Tat Bailey, Lantz Hitz, Clarence Hitz, Marjorie Hitz, Frances Hitz, George L. Upson, Rolland W. Upson, William A. Upson, Lucy N. Upson, Nellie U. Freet, Mae U. Noble, Robert Wells, the Board of Trustees of the Presbyterian Church of Table Grove, Illinois, and Gabrelia L. Hughes, individually and as executrix of the last will and testament of Lucy M. Wright, deceased, praying that the alleged will of Lucy M. Wright of July 11, 1916, and the codicil thereto of November 18, 1916, which were admitted to probate in the county court of that county, be declared null and void and that the probate thereof be set aside. The issues framed for the jury to pass on were,

(1) was the alleged will and the codicil thereto, together, the last will and testament of Lucy M. Wright; and (2) was the alleged will of July 11, 1916, the last will and testament of Lucy M. Wright. Albert Upson, Gabrelia L. Hughes, as executrix, and H. H. Atherton, as guardian *ad litem* appointed by the court for the infant defendants, George L. Upson, William A. Upson, Rolland W. Upson, Lucy N. Upson, Clarence Hitz, Marjorie Hitz and Frances Hitz, answered the bill. All of the other defendants made default except George Upson, whose death was suggested on the record. The issues were tried by a jury, and the jury found that the will and codicil are not the last will and testament of Lucy M. Wright. Albert Upson, Gabrelia L. Hughes, executrix, and the minor defendants by their guardian *ad litem,* filed a motion for a new trial, but the same was withdrawn as to the executrix on the ground that her attorney had no authority to file the same. The motion for a new trial was overruled, and the court entered a decree setting aside the will and declaring the same void, and fixed the sum of $2000 as the guardian *ad litem's* fee, to be taxed and paid out of the assets of the estate, for his services performed in the suit as guardian *ad litem.* The costs of the suit, exclusive of the guardian *ad litem's* fee, were ordered to be taxed against certain defendants and proponents, as follows: 13/40ths against Albert Upson; 6/40ths against Gabrelia L. Hughes, executrix; 20/40ths against the infant defendants, George L. Upson, William A. Upson, Rolland W. Upson and Lucy N. Upson; and 1/40th against the defendants Clarence Hitz, Marjorie Hitz and Frances Hitz, and that executions issue therefor. Albert Upson, and all the infant defendants in the suit by their guardian *ad litem,* have appealed.

Lucy M. Wright died January 22, 1917, at the age of seventy-seven years, leaving Albert Upson, her brother, Sarah M. Hummel, Martha L. Taylor and appellee as her sisters and only heirs-at-law. She died seized and pos-

sessed of a farm of 400 acres, of the value of $70,000; her homestead property in Table Grove, consisting of her dwelling house and three lots and part of another, of the value of $5000; two lots in Galesburg, of the value of about $3000; and personal property of the value of about $12,000. She was the widow of Granville Wright, who died March 8, 1906, at the age of eighty-six years. Wright was a man of affairs and at one time during his marriage with testatrix owned considerable property, including the 400-acre farm of the testatrix, but he suffered financial reverses and lost most of his property, including his farm, which he sold to one Washburn. The testatrix and her husband then leased the farm from Washburn for three years, and at the end of that time the testatrix bought the property of Washburn and incurred very heavy indebtedness in the purchase of it. It does not definitely appear when she purchased the farm, but from the showing in the record it was probably about the year 1893. From the time she purchased it she managed and controlled it and did a great deal of hard labor on the farm that only men are accustomed to do. She proved to be very successful and a very shrewd manager and business woman on the farm, and through her management and business methods and very strict economy she succeeded in paying her debts and accumulating the property of which she died possessed, including some property that she owned in her own right at the time she purchased the farm. She was very saving and penurious and continued to be so up to her death, and denied herself many comforts in the way of food and clothing, even at the times when she was well able to enjoy such comforts, and even luxuries, had she been disposed to do so. She wore very common clothing and shoes during work days and continued to wear them until they were old and worn and ragged, and often they were not sufficient to protect her from exposure to inclement weather, but on Sundays she would dress in neat and better clothing and more

suitable to her condition in life. She had at all times renters on her farm, and she was particular to dictate and detail in the leases the crops that were to be raised by them, and generally reserved in her leases a room or rooms and a barn or place to store her grain. She was very watchful of her own interests, and at all times insisted that the grain raised on the farm should be weighed so that she would get the exact amount of her rent. She moved to her residence in Table Grove in January, 1911, and continued to reside there until her death, but she continued to visit her farm often, up to and including 1915 and part of 1916, and kept close watch on her tenants and what was done on the farm, and was so strict and so exacting in the division of the rents and her supervision over her tenants as to incur the disfavor, and even the hatred, of several of them.

During the time that testatrix and her husband were living on their farm, about 1881 or 1882, her husband had two grandchildren, Gabrelia Love, (now Gabrelia L. Hughes, the executrix,) and Sarah Love, (now Sarah L. Burnhart,) who were orphans and of whom at that time he took the custody, and they continued to live with him and the testatrix until his death, and after his death they lived with the testatrix until their marriage. These two girls were treated by the testatrix as her children and with very great consideration, unquestionably up to the year 1914, and she sometimes referred to them as her adopted children, although they were not, in fact, adopted. Sarah was about seven weeks old and Gabrelia about ten years old when they were taken by their foster parents on the farm. They proved to be very bright, energetic and useful girls, and they did a great deal of work on the farm while they were there, under the management and control of the testatrix. The testatrix was, in fact, very successful in getting all parties under her control and associated with her in farm work to do good work for her and with very beneficial results.

In May, 1914, while on a visit to her farm, the testatrix received a fall which caused an injury to her arm, shoulder and head, and she thereafter complained of severe pains in her arm, neck and head and sought practitioners of various branches of medical science for aid, relief and treatment. In July, 1916, she was examined by her physician and found to be afflicted with arteriosclerosis, and at that time had a systolic pressure of 170 and a diastolic pressure of 100, which indicated considerable hardening of the arteries. In 1915 she was examined by an eye specialist and found to be afflicted with a cataract on each eye, which very materially affected her vision. In July, 1916, she was operated on for cataract of one eye in a hospital at Peoria and remained there for two weeks. After her return home from the hospital she was under the care of a professional nurse for three or four weeks and was weak and prostrated. She had her eyes bandaged during that time. In the month of November, 1916, she sustained a fall and fractured the neck of the femur. She was then removed to a hospital in Galesburg, where she remained until she died, in January, 1917. From 1914, after she received her fall, and perhaps for a short time before that, until she was operated on for cataract of the eye and until she was injured in November, 1916, suffering a fractured neck of the femur, Sarah Burnhart and her husband assisted her very greatly in transacting her business on the farm and her banking business. They drew checks for her on the bank at her request and she signed them. She was in the habit at all these times of referring parties to Sarah and her husband and of consulting them for advice, and she would consult others for advice but usually made the conclusion as to what was to be finally done in different matters. During the time she was in the hospitals at Galesburg and Peoria, Sarah and her husband looked after all of her business, but she continued to sign checks while she

was in both hospitals in July and November, 1916, payable to her nurses, doctors, the hospitals and to others.

By article 1 of her will the testatrix devised to her executors, as trustees, her homestead property in Table Grove and her property in the city of Galesburg, to have, hold, manage and control, and to sell, at their discretion, with directions to invest the proceeds in good real estate first mortgage loans. The income of all of said property by the terms of the will is to be used for the support and maintenance of her sister Martha L. Taylor while she lives and for the payment of the expenses of said sister's last illness and funeral expenses. At the death of her sister the income shall be used and applied as her executors and trustees shall deem necessary, from time to time, to educate the children now born or hereafter to be born to the testatrix's nephew, George Upson, as they arrive at proper school age, with full power and authority to so use such proceeds until the youngest of said children shall have received a high school education or its equivalent, and then the remainder of the proceeds is to be divided, share and share alike, *per stirpes,* among the children or their descendants of George Upson who are living at that time, and to have and to hold forever. By article 2 of her will her executors and trustees are directed to sell and convey, as soon after her death as they shall deem wise and prudent, to the highest bidder at public sale, all of her farm land of which she shall die seized, and to invest one-half of the proceeds thereof in farm lands in Knox county, Illinois, the title to the same to be taken in the name of her nephew, George Upson, to have and to hold during his natural life, only, and at his death the same to go to his children and their descendants, share and share alike, *per stirpes.* The land so devised to Upson for his natural life is upon the express condition that he will not lend any financial aid to Gertrude Upson, wife of Arthur E. Upson, and if he does lend such aid, directly or indirectly, she directs that the

land shall pass to his children the same as if he were dead. By article 3 the remaining one-half of the proceeds derived from the sale of her farm land is disposed of by the same terms and conditions and in the same manner as the proceeds of her homestead and other lots were disposed of by article 1, after first paying her just debts, funeral expenses, costs of administration, including costs arising from the sale of the land and the specific pecuniary legacies bequeathed by the testatrix and hereinafter mentioned. By articles 4, 7 and 8 she bequeaths to Sarah Burnhart, "for whom I have cared from her childhood," $600 in cash, "having already given to her a twenty-five hundred dollar home on conditions mentioned in said deed, the two gifts to constitute a complete payment to her of all services rendered to me during my life and shall be so accepted by her." She also bequeathed to Sarah "Leila's picture and her own picture, my aquarium, and the old bureau which belonged to grandfather Wright, to have and to hold forever." She bequeathed to Gabrelia L. Hughes, "for whom I have likewise cared from her childhood, the sum of $600, conditioned that no extra bill for services be charged against my estate." She also bequeathed to Gabrelia "my large looking-glass in the sitting room and my gold watch." By article 5 she bequeathed to her sister Sarah M. Hummel the sum of $1000 in cash. By article 6 she bequeathed to her sister Martha L. Taylor all her household furniture of every kind and character, including her piano, the canned fruit in the cellar, dishes, and all other household goods about the home where she resided in Table Grove, to have and to hold forever. By article 8 she bequeathed to Hannah F. Wright and to her brother, Albert Upson, one feather bed each; to the Presbyterian church of Table Grove $50 in cash; to Tat Bailey, a friend, one-half dozen of her best silver tea spoons, to be selected by her executors; to each of the three children of Lantz Hitz the sum of $25 as they arrive at their majority; and to Lantz Hitz

the contents of "the barn and shed, except the grain and hay." By articles 9 and 10 the will provides that in case she sells her Galesburg property prior to her death the proceeds thereof shall be disposed of by her executors under the same conditions mentioned in article 1. In case any person or persons named in her will shall contest or assist in contesting the validity of the will such person or persons shall receive no part of the estate, and any provision made for such person shall become void and the property therein mentioned become a part of the residuary estate. By article 11 she nominated Gabrelia L. Hughes, James W. Lantz and B. F. Arnold, of Galesburg, as executors and trustees, and in case of the refusal to act or the death of any one of the executors and trustees she authorized her sole surviving trustee to carry out the provisions of the will. After the estate is administered upon and all the real estate sold, the trustee or trustees handling the trust fund shall receive a reasonable compensation for the same but not a per cent on the principal of "said money," and she further directed her executors to employ E. P. Williams, of Galesburg, as their counsel and attorney in handling the estate and that he be paid reasonable compensation, and in case of his death or inability to serve she named his partner, J. D. Welsh, as attorney. The attesting clause is signed by Mary Scott, Mabel G. Gabrielson and Harriet C. Peterson, of Galesburg, and it recites that the will was subscribed, published and declared by her as her last will and testament in their presence, who at her request and in her presence, and in the presence of each other, subscribed their names as witnesses thereto, and that they believed her to be of sound mind and memory and under no constraint at the time of so signing the same.

The codicil of November 18, 1916, ratifies and confirms all the provisions in a codicil made June 15, 1916, drawn by attorney E. P. Williams and witnessed by Mary Scott, Mabel Gabrielson and Harriet Peterson, except that she

gives, devises and bequeaths to Sarah Burnhart the lots adjoining her homestead after taking out "the west two lots of that homestead, which I do not desire to give to her; on this reserved property is my house." By the codicil of November 18 she also changes the executors of "my last will so that they shall remain as B. F. Arnold, Galesburg, Illinois, my sister Sarah M. Hummel, and Mrs. Gabrelia L. Hughes, of Table Grove, and none others." She also thereby revokes and cancels any codicil or proposed codicil purporting to be made "by me betwixt June 15, 1916, and the present date." The codicil of November 18 was witnessed by Mary Scott, Hannah E. Erickson and Nelle Johnson. The attesting clause recites that the codicil purporting to be the second codicil to her last will and testament (of July 11, 1916,) was signed by her in the presence of said witnesses, and that they in her presence, and in the presence of each other, signed the same as witnesses, and at the signing and sealing of the same she was of sound mind and memory.

There is evidence in the record tending to prove that the codicil of June 15, 1916, was lost and could not be produced at the trial. A carbon copy of this codicil was produced on the trial except as to the signatures of the attesting witnesses and the testatrix. This codicil does not state on its face to what will it is a codicil, but from the evidence of lawyer Flack, who drew for the testatrix a will on June 16, 1916, it is a codicil to a will drawn by lawyer E. P. Williams between the dates of April 23, 1914, and June 15, 1916. This codicil by its terms reduces the amount theretofore bequeathed to the testatrix's sister Sarah M. Hummel, "to the sum of $1000 and no more." By it she bequeathed to Sarah Burnhart and Gabrelia Hughes each the sum of $500 in cash, conditioned that "no extra bills for services be put in," and recited that both of the legatees have remained "my faithful friends." By the third clause of her codicil she devised her homestead property

in Table Grove and her lots in Galesburg to her executors named in her will and to their survivors as trustees, to have, hold and manage, control and sell the same at their discretion, and to apply the proceeds thereof first for the use and benefit of her sister Martha L. Taylor, while she lives and to the payment of the expenses of her last illness and the funeral expenses after her death, and to have and hold the remaining proceeds after the death of her sister in trust in assisting her nephew, George Upson, in the education of his children, born and to be born, as they shall from time to time be of proper school age, and when the education of the last one of said children shall be satisfactorily completed, the remaining surplus is to be divided ratably among the surviving children, share and share alike.

The testatrix executed a number of wills during the last five years of her life. Her first three wills were drawn by Margaret M. Stewart,—two in 1911 and the third about 1912. She executed a codicil to each of the two first wills. She applied to Miss Stewart about 1914 to make a codicil to the third will, but she declined to write it and recommended that she have a lawyer write it. She executed her fourth will April 23, 1914, drawn by attorney Woolsey, which is known in the record as the Woolsey will. Lawyer E. P. Williams drew her fifth will between the dates April 23, 1914, and June 15, 1916, to which he also drew a codicil June 15, 1916, which is the codicil referred to and ratified by the codicil of November 18, 1916. Attorney C. W. Flack drafted her sixth will June 16, 1916. Attorney Williams drafted her seventh will on July 11, 1916, which is the will above set forth and contested in this suit, and also the second codicil thereto of November 18, 1916, also contested. The first codicil to this will was drawn July 20, 1916, and is the one referred to as revoked by the second codicil of November 18, 1916. The Woolsey will of April 23, 1914, exhibited the same general plan of the testatrix that is found in her last will and testament, the greater part of the prop-

erty of which she died seized and possessed being devised
to George Upson and his children after the manner of the
devise thereof in the seventh or last will, the difference in
the two wills being mainly as to the gifts to the legatees
and as to other provisions, the differences in the wills be-
ing inconsequential.   The Flack will of June 16, 1916, was
in its provisions with regard to legacies and devises iden-
tical with the provisions of her last will and testament as
to such legacies and devises, except that the Flack will con-
tained a residuary clause, by which the testatrix gave all
the rest and residue of her property, of every kind and
nature, to her brother and sisters, share and share alike,
but the record shows that by her last will she specifically
bequeathed and devised about all the property of which she
died seized or possessed.   The testimony of Flack discloses
that a large number of the provisions of the Flack will
were in the identical language as the previous will prepared
by Williams between April 23, 1914, and June 15, 1916;
that there was some little change in the will, and the tes-
tatrix expressed to him at that time that she did not want
Gertrude Upson to have any interest in or be benefited in
the least by anything that she had.   The differences in the
Flack will and in her last will not already mentioned are,
that Flack was named as attorney in the will he wrote and
Williams was named as attorney in the will he wrote, and
there was also some slight difference by the changing of
the name of one of the executors and trustees, made at
her direction.

Fifty witnesses testified on behalf of proponents of the
will, and nearly all of them testified in support of the con-
tention that testatrix was of sound mind and disposing mem-
ory at the time she executed the alleged will of July 11,
1916, and her codicils to that will.   Thirty-six of those wit-
nesses expressed the opinion that she was of sound mind
and memory at or near those times, after properly qualify-
ing themselves to express an opinion.   Five of those were

regularly licensed physicians who were acquainted with her and had treated her both before and after she executed the will. One of them saw her on that day, when she visited and consulted him at his office about her injured shoulder. He also saw her and conversed with her about her injury and condition on November 16, 17 and 18, 1916, the first time being at her home and the last two times at the hospital at Galesburg, being the day before and the day on which she executed her second codicil to the will. Another one of these physicians visited her professionally on November 15 and 16, 1916, after she had sustained a fracture of the femur. The others of the thirty-six witnesses included lawyer Flack, who drafted the will she executed in his office June 16, 1916; his stenographer; the attesting witnesses to the will of July 11, 1916, and of the codicils thereto; her bankers, merchants, farmers and neighbors of Table Grove and in the county, most of whom had known her for many years intimately and had visited and associated with and transacted business matters of various kinds for her. Proponents also put in evidence more than 140 checks signed by her in person on banks in which she had deposited her money. Fifty-three of these checks personally signed by her were signed in 1916, eight in June, eight in July, five in November and eight in December, 1916. Ten of the personal checks were signed by her in April, May and June, 1914, and eighty during the year 1915. Many of the checks were payable to various witnesses for appellee, who testified that testatrix was of unsound mind and memory in 1914 and her gradual weakening thereafter, both mentally and physically, until her death. There was also introduced evidence leading up to the giving of some of these checks. The testimony shows that E. P. Williams dictated the will and codicil of July 11, 1916, and November 18, 1916, to his stenographer in the presence of testatrix, after being informed by her as to how she wanted the will and codicil written, and when the will was written

she particularly requested that the will be made right with the Upson children, as they were poor and she wanted them to have an education in life. The will was read over to her by Williams before she signed it. While Williams was dictating the codicil at her request she corrected him as to the location of the house with reference to the barn and told him where the house stood and where the barn stood, and thereby enabled Williams to correct a mistake and to correctly describe the premises therein devised to Mrs. Burnhart.

It is the contention of counsel for appellants, supported by the testimony of their witnesses, that testatrix was a school teacher before she married Granville Wright; that although eccentric and peculiar in some of her ways she was of very strong mind and of a very saving disposition; that she possessed unusual acumen and business judgment, and was very successful in the transaction of all of her business matters from the time she bought and took over the management of the farm until she was injured by the fracture of the femur, in November, 1916; that there is not a single instance in which she failed to exercise good judgment and business management, and she never at any time sustained a loss or permitted her business to suffer for want of good, sound judgment to transact it. They also contend that although the testatrix during some of the time when she was in the hospitals at Galesburg and Peoria was physically disabled from transacting her business, she was of sound mind and memory not only up to the time she executed her will and codicils but even through December, 1916, and that her final collapse and mental decline were caused by very great suffering and the delirium occasioned therefrom. While admitting that testatrix was temporarily delirious during times she was in the hospitals, by reason of pain and suffering and the effect of medicines, they contend that the will was executed before these times and when she was mentally sound, and that the codicil of No-

vember 18 was executed on a day and at a time when she was free from delirium and well understood what she was doing and knew just what she wanted put in the will and the codicil.

Twenty-six witnesses testified for appellee that testatrix was of unsound mind and memory. At least three of these witnesses confined their testimony to the year 1916 and had not known or seen her prior thereto. One of these was a registered nurse at the Galesburg hospital, who only saw and observed her while she was there, and this witness, Hannah Erickson, witnessed the codicil of November 18, 1916. Previous to this testimony she testified in the probate court as an attesting witness that the testatrix was of sound mind and memory, and her testimony was admitted on the trial for the proponents as an attesting witness. She testified on this trial that she believed at the time she witnessed the will the testatrix was then of sound mind and memory, and she had signed the attesting clause expressing the same opinion but said that she had changed her mind since then. Another one of these three witnesses was the superintendent of the Galesburg hospital, who testified that she had visited the testatrix November 16, 1916, and up to her death, but had no conversation with her. She based her opinion that she was of unsound mind and memory upon the fact that she was delirious much of the time, and that she talked incoherently at times and when no one was engaging her in conversation. She also testified that a great deal of this time testatrix suffered a great deal of pain from her injuries, and stated that she did not pretend to be an expert on insanity. The other of these three witnesses, who examined her eyes in April and in July, 1916, as an eye specialist, based his judgment that she was not of sound mind upon her statement to him that she was poor and on her rambling talk. On cross-examination he stated that he did not charge her for the first trip but did charge her for the second treatment and accepted her check. He had

found out from another doctor that "he had got stung," referring to the fact that he had learned that she had considerable property. He also stated that he was not an expert on insanity.

Four physicians who are experts on insanity, who had never known the testatrix, testified in answer to a hypothetical question that she was of unsound mind and memory during the whole of the time covered by the facts stated in the question, which covered the years from about 1905, or prior thereto, until her death. All of the other witnesses, except three, testified that the testatrix was of unsound mind and memory and confined their testimony to the years 1915 and 1916, generally, and none of them testified as to unsoundness prior to the year 1914. One of these witnesses confined her testimony to a few weeks in 1915. She was a niece of the testatrix, her name being Mary Taylor, was thirty-five years of age and the daughter of testatrix's sister Martha. Another one of these witnesses, Sarah Burnhart, who lived in the house adjoining the homestead of the testatrix and who saw her almost every day in 1914 and 1915, expressed the opinion that she was of unsound mind and memory during those years, and confined such testimony to the time of the testatrix's injury in 1914 up to her death, in January, 1917. The substance of her testimony is, that after the testatrix received her fall, in May, 1914, witness observed a change in her mental and physical health and that she almost constantly complained of pain about her head. This witness is one of her foster daughters, who is a legatee in the will and who had lived with the testatrix, or near her, since she was seven weeks old, and when she testified she was thirty-eight years of age. She also testified that she had not been promised anything if the will was set aside.

Of the three witnesses whose testimony as to unsoundness extended over a period of more than the three years aforesaid, one was a dentist, who expressed the opinion that

the testatrix was of unsound mind and memory about the
year 1913. The other two of these three were tenants of
the testatrix on her farm and who disclosed by their tes-
timony that they had very bitter feelings toward her. One
of these tenants testified rather reluctantly, after being
pressed to it, that he would have to say that she was of
unsound mind at times during the years 1912 and 1913, and
he based his testimony upon his having seen her "do little
things that I thought a person that was in their right mind
wouldn't do." The particular thing he related that she did
that was unusual was the breaking up of hen's nests by
putting sticks and other things in the nests. At another
time he told about her driving a sick cow that belonged
to him out of her lot, this being repeatedly done by her
on the day the cow was sick after he would drive her back
into the lot. Another unusual thing that she did was to
take a little more straw than he thought belonged to her
from a stack of straw belonging to both of them, after
the stack had been divided by cutting it in halves. He also
saw her when she was out at the farm pick up old pieces
of boards and shingles and fill her buggy with them and
take them home with her. The other tenant testified that
testatrix was of unsound mind and memory in 1910 and
1911, while he was a tenant on her farm. He based his
testimony upon the fact that she was what he called "child-
ish" and did not "sustain a connected conversation with"
him. He said he could not explain it, but that she would
go right along. One day she would have one proposition
about the things on the farm and the next day she would
have another, and that she would change from one day to
the next. He confined his testimony, as also did the other
tenant, to the times they were tenants on the farm. This
witness was very bitter toward her, and expressly stated
that he never talked to her unless he had to. He also
spoke of another time when he asked her for staples and
nails to build a fence that she would bring them in small

amounts, but that he usually got what he wanted from her except as to this fence.

One of appellee's witnesses who had known the testatrix twenty-eight years testified that she was pretty keen and shrewd in business matters up until the last two or three years of her life. Another of appellee's witnesses who had known testatrix all her life testified that she was all right when she was on the farm, and that she was of sound mind then before she moved to town and that she wore old clothes during that time. Still another witness for appellee who had known the testatrix for forty years, and who testified that she was of unsound mind and memory in the last two or three years of her life, testified that he did not know of any business transaction that she ever had in which she did not take care of herself; that she knew what to do and how to do to take care of herself in business matters; that she was very shrewd and keen in business matters, and that up to the very last time he saw her she retained control over her property matters and had the final say in those matters but counseled with her two foster daughters.

The facts relied upon by appellee to establish mental unsoundness of the testatrix, and upon some one or more of which various witnesses for appellee based their opinion that she was of unsound mind and memory, are the following: Her physical condition and suffering from her injuries and surgical operations already related, it being their claim that for the last three or four years of her life she was on the decline, mentally and physically; that she walked with a feeble and infirm step and quickly became weary and required much rest; that when seated she got up with great difficulty and sometimes required assistance to get up; that she suffered from arteriosclerosis, and from pyorrhea, occasioned by bad teeth; that she was possessed of false notions at various times that she was poor and had no property, and therefore wore bad and insufficient clothing and shoes, and at times thought the water in

one of her wells and some of her food were poisoned, and various persons, including some of her closest friends, were scheming against her and trying to do her injury; that she frequently cried during these times and was incoherent and disconnected in her conversations, often repeating the same remark and forgetting the subject of her conversation; that she was eccentric, peculiar and irritable, and frequently made expressions that her mind was failing and that she could not trust herself to transact her business properly, and would frequently lose or misplace various articles and would not be able to find them. It is also claimed that she made a number of wills and codicils and frequently changed them during the last five or six years of her life, and that was a further evidence of insanity or unsoundness of mind. There were other facts relied upon as such proof which appellants claim occurred at times when she was unquestionably of sound mind, and that such facts were no indication of insanity and were improperly admitted to establish such facts, which will be considered later in this opinion.

Upon the question of the sufficiency of the evidence in this record to establish either mental soundness or unsoundness of the testatrix during the last five or six years of her life we express no opinion, and it would be improper to do so in view of the fact that the judgment must be reversed for errors appearing in the record. It is proper to state, however, that there is absolutely no testimony in the record given by any witness that shows or tends to show that she was of unsound mind and memory prior to the years 1910 and 1911. The overwhelming weight of the evidence of appellee, as well as that of appellants, is to the effect that she was of sound mind and disposing memory at all times prior to the years 1912 and 1913, as already indicated. The positive testimony of Sarah Burnhart, her foster daughter, who had lived with her or by her and saw her every day, or about every day, for thirty-eight

years, and who had the best opportunity of anyone to know, and whose testimony was given for and whose sympathy was clearly with appellee in this case, is to the effect that she discovered nothing in the testatrix's conduct or actions that indicated unsoundness of mind prior to May, 1914, when she received her injury to her shoulder, neck and head. She positively testified that before the latter part of April, 1914, the testatrix never had the belief that the water in her well was poisoned, and she further testified that testatrix had always been in the habit of gathering up bolts and taps and old buckets, and other such things, and saving them; that that was her characteristic, as she did not want anything to go to waste, and she explained this on the ground that she was very close and saving,—so close that she was miserly,—and that this habit grew on her as she got older. A chiropractic physician testified that the testatrix's belief that she had at times lice on her head was occasioned by the fact of the injury to her shoulder, head and neck in May, 1914, and that that injury produced a crawly feeling or sensation in the scalp which made her really feel as if there were lice, insects or vermin crawling on her head. The facts that she wore ragged clothing, unsuitable to her condition, and that she collected and saved bolts, nuts and various things of little consequence or value, and was saving, and did other acts that indicated closeness and stinginess to a degree that might be characterized as niggardly, furnish the basis, or the chief basis, of the testimony of several of the appellee's witnesses to the effect that she was of unsound mind. In fact, there are a number of transactions recited in the record by appellee's witnesses, at times when testatrix was unquestionably of sound mind and memory, that simply show her to be stingy and miserly to such an extent as to make the question of her honesty in dealings very questionable at times, and that is really all that such evidence tends to prove. For instance, the facts testified to by W. L. Strode that she would not

allow him to have his sick cow in her lot, and that she .
broke up hen's nests, and that she destroyed about fifteen
guineas for J. W. Strode in 1910, and cut off the pumpkins
on several acres of pumpkin vines while J. W. Strode was
her tenant, were of this character of evidence, and she was
evidently moved to do those things because she regarded
them as nuisances and harmful to her interests on the farm;
that the cow, the guineas, hen's nests, pumpkins, etc., were
no source of revenue to her. Testimony of a similar char-
acter is that of W. L. Strode that she took more than her
half of the straw in the straw pile after it was halved, and
that she had a personal contest and falling out with Albert
Upson concerning the division of rents about the year 1901
or before, in which latter difficulty Upson struck her be-
cause she was interfering with his getting part of his son's
rent wheat.

The first error assigned and argued by appellants is, that
the court erred in refusing to permit them, on rebuttal, to
introduce in evidence the Flack and Woolsey wills, executed
by the testatrix in 1916 and in 1914, and which they offered
for the purpose of showing that she was of sound mind and
memory at the time she executed the will contested in this
suit. Their claim is that the provisions of these two wills
are in substantial conformity to the will in question, and
which claim, for the purposes of this ruling, may be con-
ceded. Appellee objected to the introduction of these wills
for the purposes aforesaid on the ground that they were
not executed at a time when the deceased was conceded to
be competent to make a will, and that the evidence of ap-
pellee tends to prove that at those times the testatrix was
not of sound mind and memory. The testimony of appel-
lee, as already disclosed, did tend to show that the testa-
trix was of unsound mind and memory during the year
1914 and from that year until her death. The rule is well
established that in order for former declarations or for-
mer wills executed by the testator to be admissible for the

purposes aforesaid, such declarations and the provisions of such wills must be in substantial conformity with the provisions of the contested will and be made or executed at times when the testator is conceded to have been of sound mind and memory. (*Nieman* v. *Schnitker*, 181 Ill. 400; *Dillman* v. *McDanel*, 222 id. 276; *Kaenders* v. *Montague*, 180 id. 300; *Hill* v. *Bahrns*, 158 id. 314.) The reasons for the rule are obvious. If such former declarations and former wills were executed at a time when the testator was unquestionably of sound mind and disposing memory they furnish very strong evidence of the soundness of mind of the testator at the time the will in question was executed, but if the soundness of mind of the testator is questionable at both times, a conclusion or presumption of soundness of mind does not naturally follow. The court therefore properly refused to admit these two former wills in evidence for such purposes.

Over the objection of appellants Sarah Burnhart testified for the appellee that the testatrix compelled Granville Wright, her husband, to remain up-stairs in their house on the farm for a period of several months prior to his death although he wanted to stay down-stairs and read; that the room in which she kept him was a small room with no toilet articles or facilities, and she would only let him come down to his meals; that she would not allow him to use tobacco, and would take it out of his hands or out of his pockets, if he had any in his pockets. She also testified that she told the testatrix she had no reason to treat Wright that way; that the testatrix replied that she wanted to know where he was. This witness also testified that Wright's mental condition was very bad for the last two months of his life, and that he would wander around and away from home unless he was confined. Not only was this testimony admitted against the objection of appellants, but other witnesses were permitted to testify to the same facts, and to further acts of the testatrix requiring Wright

to do considerable work when he was very old and not very able to work. These acts occurred in 1905 and 1906, at which times there is no claim or evidence on the part of appellee tending to show that she was of unsound mind. This evidence only tended to blacken the reputation or character of the testatrix and to prejudice the jury against her, and it had no proper place in the record as it did not tend to establish any fact in issue in the trial. We have already related other facts that were admitted in evidence over the objection of the appellants that tended to blacken the reputation of the testatrix for honesty and fair dealing, which acts had no tendency to prove any issue in the case and occurred at times when the testimony of even the appellee failed to show or tend to prove that she was not of sound mind and disposing memory. These same facts, or about all of them, were incorporated in the hypothetical question submitted to the four expert physicians, none of whom were ever acquainted with the testatrix, and in answer to the hypothetical question they all testified, in substance, that she was of unsound mind and memory during the whole time covered by the hypothetical question, which was from about 1903, or earlier, up to the time of her death. The testimony of the experts also clearly showed that their opinions were based, in part, upon such irrelevant and improper testimony. We can scarcely conceive of any character of evidence that would be more prejudicial to appellants than the testimony aforesaid. The only purpose or effect of such testimony was to exhibit the frailties or moral delinquencies of the testatrix, and such evidence has been frequently condemned by this court. *Snell* v. *Weldon,* 239 Ill. 279; *Graham* v. *Deuterman,* 217 id. 235; *Rowcliffe* v. *Belson,* 261 id. 566.

Three instructions offered on behalf of appellee advised the jury that if the testatrix did not know or was not capable of knowing the natural objects of her bounty they should find that she was incompetent to make a will. There

was no evidence in the record that warranted the giving of these instructions, as the only evidence upon the subject was to the effect that she did know the natural objects of her bounty at the time she made the will. Two of these instructions also advised the jury that the testatrix must have a sufficiently active memory to collect in her mind the elements of the business she was transacting in making her will and to hold them in her mind for a sufficient length of time to perceive their obvious relation to each other and to be able to form a rational judgment with reference thereto, and that if she did not understand the nature of the act or business in which she was then engaged or the kind and extent of her property or her relation to those who were the natural objects of her bounty and the general scope and bearing of the provisions of her alleged will, and did not have sufficient memory to collect in her mind the elements of the business which she was then transacting in making the alleged will and to hold them in her mind for a sufficient length of time to perceive their obvious relation to each other and to be able to form a rational judgment with reference to them, the jury were instructed that she was not of sound mind and disposing memory, within the meaning of the law, at the time of the making of the will. The foregoing propositions are by no means a lucid statement of the law and were calculated to mislead the jury. Similar instructions have been condemned as misleading and as presenting a standard far above that which the law requires to make a valid will. *Carpenter* v. *Calvert*, 83 Ill. 62; *Norton* v. *Clark*, 253 id. 557.

Over the objection of appellants the complete record of the hospital at Galesburg, compiled by the registered nurses and pertaining to the testatrix and her physical and mental condition, and all foods, treatments and medicines administered to her during the time she was in the hospital, was admitted in evidence on behalf of appellee. Assuming, but not deciding, that some portions of this record might

have been admissible if the proper proof had been furnished as to the same, there is much in the record that had no sort of bearing on the issues in the case, as is clearly apparent. The admission of the entire record by the court was erroneous for the further reason that the hospital record was the product of two or more registered nurses, each nurse making entries only at the time and for the time during which she nursed the testatrix. Only one nurse, Miss Erickson, was called to testify as to the correctness of the entries made by her and as to the times they were entered. There is no such proof of the entries made by the other nurse or nurses, and there was no showing in the record that the other registered nurse or nurses were deceased or out of the jurisdiction of the court. If the hospital record is admissible at all it is for the same reason that books of account are admissible and the same character of proof is required, and all persons who make entries therein are required to testify to their correctness before they are admitted in evidence. In a contest like this, evidence as to the physical and mental condition of the testatrix while in the hospital shortly before and after the time of the execution of the second codicil, is admissible, and there is much reason for allowing the nurses who made this record and who know the correctness of it, to refresh their recollection from their own notes and to testify as to the mental and physical condition of the testatrix at this time. There are many reasons why such notes or entries should not be admitted as original evidence, and we are clearly of the opinion that the record in this case ought not to have been admitted, or any part of it, not only for the reasons aforesaid, but for the further reason that many of the entries merely amount to conclusions of the nurses. We might say, generally, that there are cases in which a hospital chart would be admissible in evidence against a party where there is any showing or reason why one of the parties should be bound thereby, as in case of a suit against a surgeon, where it is

alleged that he wrongfully and negligently operated on a patient or wrongfully or negligently treated the case, where the chart or record was kept by the nurses for his information. There is no such reason why the testatrix or any party to this suit should be bound by the record of the hospital in this suit. An interesting and instructive note is to be found upon this subject following the case of *Osborne* v. *Grand Trunk Railroad Co.* Ann. Cas. 1916C, 74.

Complaint is made by appellants that during the trial attorneys for appellee made repeated statements and remarks in the presence of the jury calculated to belittle one or more of the opposing counsel and to question their sincerity and integrity, to frighten and unnerve witnesses, and even conduct that was disrespectful to the court and calculated to divert the minds of the jurors from the real issues in the case and procure a decision upon improper and irrelevant considerations. This court has great consideration for all the attorneys in this State who practice the profession of the law, and we are very much averse to criticising them and employing stinging language concerning them even when the record is full of evidence of their misconduct. We do not desire to repeat or detail any of the occurrences in the record relating to such conduct but will simply say that the entire complaint of counsel made in this case is sustained by the record. This court would be warranted in reversing the decree in this case on this objection, alone. Upon a consideration of the merits of the case, the evidence is in such a state that the decree rendered can not at any time be sustained if there is any substantial error in the record. In conclusion, as to this objection, we must make it plain that before this decree can be affirmed the record must be free from error and the conduct of counsel be such that no just complaint can be urged against it.

Counsel for appellee assign as cross-errors, and insist in the first place, that it was error to tax as costs against the estate a solicitor's fee for the guardian *ad litem* of

303—10

$2000. The court appointing a guardian *ad litem* should see that no unncessary or improper defense is interposed by him and that the interests of the infant are protected by such proper defense as he may have. In other words, it is the duty of the guardian *ad litem* to make only a proper defense and to incur no unnecessary expenses in making the same. Under our statute the guardian *ad litem* is entitled to a reasonable fee for making a reasonable and necessary defense, and it is proper in cases of this kind to tax such fee as costs or expenses against the estate. (*Baker* v. *Baker,* 202 Ill. 595; *Comstock* v. *Redmond,* 252 id. 522; *People* v. *Pasfield,* 284 id. 450.) Only a reasonable allowance should be made by the court, and such reasonable amount should be fixed by the testimony of attorneys as to what is a customary fee for the services performed in cases wherein the fee is the subject of contract between the solicitor and client. The fee in this case was not based on proper testimony of attorneys. The question ought not to be submitted to them as to what is a reasonable fee, merely, or as to what is the customary fee allowed in such cases, but the question for them to answer is what is the customary fee in such cases where the fee is the subject of contract between solicitor and client, and the court is supposed to know and understand himself what is such fee and is not absolutely bound by the testimony of attorneys, particularly where the same appears to him to be unreasonable.

There are other questions raised on this record that do not require a decision, as they may not occur or will be obviated on another trial. The record is not sufficient upon which to base a decision on some of the points. For instance, it is claimed by appellee that the codicil of June 15, 1916, (which was expressly confirmed as a part of the will of July 11, 1916, by the second codicil of November 18, 1916,) is properly a part of the will in case the codicil of November 18 is finally sustained, and that that codicil should have been produced by appellants. Appellants con-

tend that such codicil is not made an issue in this case by appellee's bill, and it is true that there is no reference to it in the bill. There is evidence in the record tending to show that it was lost, and it is contended, also, that there is a presumption that it may have been destroyed by the testatrix. It does not appear from the record whether or not this codicil was probated as a part of the will in question. Considering the fact that the testatrix was in the hospital on and after the time of the making of her second or last codicil, it would seem to be an easy matter to establish all the facts concerning the existence or destruction of this codicil by the testatrix and all other facts, if the codicil is to have any important bearing on this case.

For the reasons aforesaid the decree is reversed and the cause remanded.

*Reversed and remanded.*