*In re* ESTATE OF MARGARET RUPINSKI, deceased—(MARY SADOWSKI, Plaintiff-Appellant, *v.* WALTER FRANCKOWIAK *et al.*, Defendants-Appellees.)

(No. 54201; ▮▮▮▮▮▮▮▮▮▮

First District—November 17, 1970.

*Rehearing denied December 15, 1970.*

Edward L. Stepnowski, of Chicago, for appellant.

Kent, Litow & Wagner, of Chicago, (George H. Litow, of counsel,) for appellees.

Mr. PRESIDING JUSTICE McCORMICK delivered the opinion of the court:

Margaret Rupinski made a will and deed in favor of the defendants, Walter and Lottie Franckowiak. Two separate suits were filed against defendants, seeking to set aside the will and deed, and the suits were consolidated for trial. At trial the jury returned a verdict for the defendants and the court entered judgment accordingly.

Mary Sadowski, plaintiff, is Margaret Rupinski's half-sister; the Franckowiaks, who lived a block from the deceased, are not related to her. Margaret's will, dated February 22, 1963, left her property to the defen-

dants, and the deed which she executed on March 25, 1963, transferred title of her apartment building to them. The deceased left $1.00 to Mary Sadowski, her half-sister, who filed a lawsuit to set aside the will. Mary Sadowski alleged that the will had been procured through undue influence and, alternatively, that Margaret Rupinski had lacked the necessary mental capacity to execute valid documents.

Lottie Sterna, Margaret's niece and court-appointed conservator, also filed a lawsuit [before Margaret's death] by which she sought to set aside the deed executed in favor of the Franckowiaks. She alleged that the deed lacked consideration and that the grantor was incompetent at the time it was executed. The allegation was abandoned as no evidence was introduced to support it.

Lottie Sterna did not join in the notice of appeal to this court; therefore, the only plaintiff before us is Mary Sadowski.

Barney Klecka, a tenant of Margaret Rupinski's, testified that he lived on the second floor and that Margaret, a widow, lived alone on the first floor. He stated that as of August 1962, Margaret's health was "fairly good"; that she did her own housekeeping, and generally cared for herself. The witness testified that Margaret drank a lot; that she "would mix her whiskey with aspirins. It was common for her to use a bottle of one hundred aspirins per week." He stated that she complained of pain in her legs and occasionally fell, although he was not sure whether her unsteadiness was due to her drinking or to her arthritic condition. He said that she became argumentative and "more or less hysterical."

Klecka further testified that he made arrangements to take Margaret to Loretto Hospital, but Lottie Franckowiak said she would take her, and the next time he saw Margaret was in April of 1963 when she came to his house dressed in her nightgown and begged the Kleckas to let her stay with them. He said he was unable to accommodate her. She had been staying with the defendants, and the witness said he had tried to see her there several times, but had always been denied entrance. He added that in January of 1963 Lottie Franckowiak and her daughter had removed everything of Margaret's except the stove from her apartment. He said that on March 25, 1963, he was served with a landlord's five-day notice signed by Walter Franckowiak.

Margaret Rupinski died on April 4, 1964. In November of 1963 she had been declared incompetent and Lottie Sterna was appointed as her conservator. In testifying at the competency hearing Klecka stated that in his opinion Margaret Rupinski was not of sound mind in late December of 1962, nor in April 1963.

Defendant Lottie Franckowiak was called by plaintiff as an adverse witness under section 60 of the Civil Practice Act [Ill. Rev. Stat. 1965,

ch. 110, par. 60]. She testified that she took Margaret Rupinski to Loretto Hospital in December 1962, after the pastor had asked her to look in on Margaret; that when Margaret was discharged on January 9, 1963, the defendant took her home with her where she remained until January 16, 1963, when she was taken to Holy Cross Hospital. After being discharged from Holy Cross on February 10, 1963, she was again taken to the defendants' home where she remained until November 9, 1963, when she left with Lottie Sterna, her conservator. The defendant testified that while Margaret was in the hospital she did not cry or tremble, although she did complain of pain; that she knew people around her and was easily understood. She paid her own hospital bills with pension checks, and after her release from the hospital she asked the defendant to drive her to a savings and loan company to have checks made out for the doctor bills, and to go to her safe deposit box.

The defendant further testified that Barney Klecka never came to their home, except one time when she brought him there to pay his rent. According to the defendant, Margaret disliked her sister, Mary Sadowski, because she had tried to have Margaret sign over her house to her. Since her refusal, none of her relatives had come to see her during the 12 years before she went to live with the defendants. When Margaret decided to prepare her will she called her attorney to come to the defendants' home.

Defendant Walter Franckowiak was also called as an adverse witness, and stated that in May and June of 1963 he advertised for sale the property they had acquired from Margaret Rupinski, and that he signed a sales contract for about $15,000. He stated that in June of 1963, about four months after Margaret had come to live with them, Mary Sadowski came over with Lottie Sterna and Marion Sadowski. They introduced themselves as relatives of Margaret's, and the defendants left them alone with her to visit. He stated that "there was a commotion and Mrs. Sterna and Mrs. Sadowski were dragging Mrs. Rupinski out of the house * * *" When he asked Margaret if she wanted to leave she said she did not, but wanted to avoid trouble. He then ordered the relatives to leave, and Mrs. Sadowski "was standing in the middle of the sidewalk and hollering in Polish that we had robbed the old lady, that we had taken her property and her money and just kept ranting and raving."

Dr. Thaddeus Klabacha was called on behalf of plaintiff and his testimony was quite damaging to her case. He stated he had known Margaret Rupinski since 1948, had seen her many times at her home, and had treated her in Holy Cross Hospital in 1963. She had complained of abdominal pains and had high blood pressure. When asked if the patient had at any time seemed disoriented while at the hospital, the doctor said, "I don't believe she was disoriented." He said he had seen

the patient every day at Holy Cross Hospital from January 16, 1963 to February 10, 1963, and he maintained that she was mentally capable of knowing what she was doing, and appeared to know who her relatives were at that time. He further stated that he had not sent her to a psychiatrist because she had not appeared to him to be mentally unsound.

Marion Sadowski testified that he and his sister came to the defendants' home on May 5, 1963, to visit his aunt, Margaret Rupinski. He said that when they first awakened her she did not recognize them, but "after we explained who we were, she started to cry and she started to hug us and she was quite happy to see us." He stated that he believed his aunt was confused at the time and not mentally sound. On cross-examination Marion Sadowski admitted that during the period of his aunt's hospitalization and for months thereafter he had made no effort to see her, and that he did not see her on February 22, 1963 or on March 25, 1963, the dates on which she had executed her will and deed, respectively. As a matter of fact, the witness saw Margaret Rupinski only two times during 1963, once on May 5, and a second time when he testified at her competency hearing in November.

Dominick Varraveto, Jr., an attorney, was called on behalf of the defendants, and testified that he had witnessed the signing of the will of Margaret Rupinski on February 22, 1963, at the home of the defendants. He said it was his opinion that the testatrix "was fully competent to sign this will"; that during a full conversation with her just prior to her signing the will, he had found her responsive and in complete understanding of who were the "natural objects of her bounty." He further testified that because of his legal experience he went into some detail with the testatrix regarding what she wanted in her will, and he found no evidence of any undue influence. He had not met her before that meeting so his opinion was based upon her condition at that time.

Mrs. Frances Topel also testified on behalf of the defendants, and stated that she had known Margaret Rupinski for over 20 years; that in October of 1962 she shopped for Margaret when she had difficulty in getting around. She stated that she had not seen Margaret Rupinski in the hospital but had seen her the next spring when she was staying with the defendants, and that she had appeared to be very happy. The witness further testified that she had seen Margaret often during the summer and that frequently she had seen her with the defendants' four-year-old child; that Margaret appeared "very good, very strong, because she even picked up the child, * * *" She stated that if Margaret had any illnesses they were physical, and that she had noticed no change in her mental ability.

Another witness for the defendants, Anthony Matavosky, testified that

he had witnessed the signing of Margaret Rupinski's will; that she was of sound mind at the time and knew the people around her; that he observed no "conduct or influence by anyone, upon Mrs. Rupinski, in connection with" the will. He further stated that the defendants were not even in the room when the will was signed.

Over plaintiff's objection the court permitted the jury to take into the jury room a photostat of the contested will, on the back of which photostat appeared a stamp containing the following:

In the Circuit Court of Cook County: Illinois Probate Division
Will proved and admitted to record in open Court this 11 day of April A.D. 1966

H. Keleher
Joseph J. McDonough
Clerk of the Circuit Court

The plaintiff in this court urges that the endorsement was objectionable "in that it gave to the cause of the proponent the support of the finding of the Probate Court and further such endorsement could throw no light on the issue of undue influence." In support of this proposition the plaintiff cites only *Weston v. Teufel*, 213 Ill. 291 decided in 1904, at which time it was the burden of the party seeking to uphold the validity of a will to establish the will's validity.

"Formerly, in a will contest suit, the proponent of the will was required to make a *prima facie* case by showing the will and its execution complied with the statutory requirements. (*Donovan v. St. Joseph's Home*, 295 Ill. 125.) This procedure, however, has been changed by statute and by the rules of this court." *Metzger v. Mowe*, 8 Ill.2d 274, 277.

By statute [Ill. Rev. Stat. 1965, ch. 3, par. 92] and court decision [*Friberg v. Zeutschel*, 379 Ill. 480, 486], it is now the contestant's duty to establish the will's invalidity. Thus, the jury's knowledge that the will has been admitted to probate no longer bears the relevance it did under the old practice, since it is now presumed that the will is valid, and proof of the invalidity is the contestant's burden.

■■ The endorsement involved in the instant case was not called to the jury's attention as it was in *Weston*, and this court could not characterize the evidence here as "sharply conflicting and irreconcilable" or "a close one on the proof" as in *Weston* [page 297]. In the matter before us the plaintiffs had a very weak case at best, and the endorsement could not, in our opinion, have made any difference in the jury's verdict.

The plaintiff also complains of being denied the right to poll the jury, and states in her brief:

"At the conclusion of the trial the court asked counsel for both parties to stipulate that the jury return a sealed verdict to be opened on December 3, 1968, at 10:00 A.M., which stipulation was agreed to by counsel for the plaintiff, and court was adjourned. On December 3, 1968, at 10:00 A.M., plaintiff and her attorney appeared and were informed by the court that a verdict had been rendered against the plaintiff."

This is apparently an attempt to show that the plaintiff was misinformed by the court and tricked into appearing too late to hear the verdict. However, in the report of proceedings, the following colloquy appears:

"The Court: Gentlemen, are you agreeable that this be a signed and sealed verdict?

Mr. Litow: Yes, Your Honor.

Mr. Stepnowski: Yes, Your Honor.

The Court: I will wait a couple hours, anyhow, if you want to wait around. Otherwise, I will seal it and read it in court in the morning at 10:00 o'clock; but I intend to stay around until 3:30, anyhow."

This is a clear statement by the judge that he was going to wait until about 3:30 that afternoon to see if the jury would return a verdict and that he had every intention of reading it in court that afternoon if it was returned. In saying "otherwise" he implied that if no verdict had been reached by that time he would seal it and read it in court the following morning.

■■ Plaintiff's version of these facts is misleading. The court made its intention clear and carried out the intention. It is possible that counsel for the plaintiff felt the jury would not reach its verdict that afternoon and decided not to wait. The jury's ability to resolve the matter without much delay is hardly ground for reversing the judgment. The right to poll a jury is dependent upon one's request to do so, and in this case the plaintiff chose to absent herself when the verdict was returned. Consequently, she is no longer entitled to request that the jury be polled, and her argument that she was denied a fair trial because she could not poll the jury is specious, since she was denied such right by her own act of leaving the courtroom before the expiration of the time set by the court to await the verdict.

■■ When the defendants were called by plaintiff as adverse witnesses under section 60 of the Civil Practice Act, Lottie Franckowiak testified that she had not signed any hospital documents, but that Margaret Rupinski had signed them all. Counsel for the plaintiff then attempted

to introduce into evidence some hospital documents signed by Lottie Franckowiak, but the trial judge refused, saying that Lottie Franckowiak was the plaintiff's witness and "you can't impeach her." It is true that section 60 of the Civil Practice Act does give the right to the party calling the adverse witness to "rebut the testimony given by counter-testimony," and he may further "impeach the witness by proof of prior inconsistent statements."

■■ The matter counsel attempted to introduce into evidence was not important, considering the entire trial. It is apparent to this court that the evidence against plaintiff's case was overwhelming. There was testimony from the decedent's family doctor, from close friends, and from those witnessing the signing of the will, all of which supported the case of the defendants. The results would not have been different if the plaintiff had been allowed to introduce evidence of a hospital document signed by Lottie Franckowiak when she had testified that she signed none.

■■ The plaintiff attempted to have records of both Loretto and Holy Cross Hospitals admitted into evidence which, according to plaintiff, "would have shown the periods of hospitalization immediately prior to the alleged instances of undue influence." There is no dispute here, however, and no question as to the time Margaret Rupinski was hospitalized. The defendants themselves testified that she came into their home from the hospitals, and admitting the records would have served no useful purpose. In fact, plaintiff attempted to have the documents admitted through testimony of Sophie Petkus, assistant to the medical librarian of Loretto Hospital, and Barbara Thelin of Holy Cross Hospital, who only brought the records to court. No person directly responsible for the contents of the documents was put on the stand, nor was any excuse offered for such failure. The records were properly refused. *Wright v. Upson*, 303 Ill. 120, 144; *Plewe v. Chicago Motor Coach Co.*, 283 Ill.App. 57, 63.

■■ Counsel for plaintiff next argues that the trial judge assumed the role of an adversary and so committed reversible error, and that through his rulings he displayed a hostile attitude. The fact was that the judge serveral times rebuked counsel for the defendants, outside the presence of the jury. We must agree with the statement in defendants' brief that the judge "was patient, courteous to all, dignified throughout a long and arduous trial and particularly concerned with conducting a scrupulously fair and objective trial." The judge's occasional rulings against the plaintiff do not indicate hostility, particularly when the record shows that there was good reason for such rulings.

■■ The plaintiff argues that the court erred in refusing to give plaintiff's instructions 4, 5 and 6, and in having given three of defendants'

instructions. All the instructions are not included in the excerpts of the record. It has been repeatedly held that upon failure to include all instructions, offered and refused, in an abstract or excerpts of record, this court need not consider the argument. *Dempski v. Dempski*, 27 Ill.2d 69, 77; *Rench v. Bevard*, 29 Ill.App.2d 174, 185.

Plaintiff's final argument, captioned COMPLAINT WAS ALSO BASED on UNDUE INFLUENCE, is no more sound than the heading. It would appear that plaintiff is asserting that her case on undue influence was proved since most of that argument tries to point out what the defendants would have done if they had truly had Margaret Rupinski's best interests at heart. In effect, the argument is one which might be made to a jury; however, in this case the jury has already rendered what we consider a correct verdict. Despite plaintiff's unfounded assertions such as "There is no question that Lottie Franckowiak was an active agent in procuring a will and other documents in her favor from a testator enfeebled by age and illness," the jury wisely judged differently.

The jury was also entitled to believe Mrs. Topel's testimony that Margaret Rupinski was happy to be staying with the defendants, rather than Barney Klecka's story about her running about in her nightgown begging for entry to his residence and his testimony about Margaret Rupinski's consuming 100 aspirins a week while drinking whiskey. The jury might also have wondered why Margaret Rupinski did not revoke her will once she was out of the allegedly oppressive atmosphere of the defendants' home, since she did not die until the following April after her removal by Lottie Sterna in November. Further, the jury may have been impressed with Dr. Klabacha's testimony with reference to Margaret Rupinski's mental competence, especially since he had known her for 15 years, and testified as to her mental state just 12 days prior to signing her will.

■■ The jurors had ample evidence to support their verdict. The judgment of the Circuit Court is affirmed.

Judgment affirmed.

LYONS and BURKE, JJ., concur.