People of the State of Illinois, Plaintiff-Appellee, v. Odies Morgan, Defendant-Appellant.

Gen. No. 52,908.

First District, Second Division.
September 16, 1969.
Rehearing denied October 23, 1969.

Gerald W. Getty, Public Defender of Cook County, of Chicago (Ronald P. Katz and James J. Doherty, Assistant Public Defenders, of counsel), for appellant.

Edward V. Hanrahan, State's Attorney of Cook County, of Chicago (Robert Kelty, Special Assistant State's Attorney, and Elmer C. Kissane, Assistant State's Attorney, of counsel), for appellee.

MR. PRESIDING JUSTICE LYONS delivered the opinion of the court.

Odies Morgan, indicted for murder, was found guilty following a bench trial of the offense of voluntary manslaughter. Judgment was entered on the finding and he was sentenced to a term of not less than two, nor more than eight years in the Illinois State Penitentiary. In this appeal the defendant contends (a) that he was not proven guilty beyond a reasonable doubt, and (b) that the trial court erred in entering a "compromise finding" of guilty of voluntary manslaughter. The defendant argues under this second contention that since he presented evidence on self-defense he could only have properly been found guilty or not guilty of murder as charged in the indictment.

The evidence produced by the State established that on September 4, 1966, the date of the homicide, both the defendant and Alvin Broussard, Jr. were employed at the Malibu Lounge, located on west Sixty-third Street in the City of Chicago. Morgan was assigned to the Malibu by the Metropolitan Detective Agency, his employer. As security guard at the Malibu, his responsibility was to check identification cards at the door and to keep disturbances which might occur within the establishment down. He wore a uniform similar to that of Chicago police officers and carried a revolver, handcuffs, nightstick and flashlight. Broussard was employed as waiter.

422

At approximately 2:15 a. m. on the above date Morgan shot and killed Broussard. There exist discrepancies between the testimony of various occurrence witnesses with respect to the events immediately preceding the homicide. Raymond Burgo, bartender and assistant manager of the lounge, was on duty at the time of the homicide. He testified that his attention was first drawn to the defendant and Broussard, who were standing near the front door of the establishment, when the conversation in which they were engaged became loud and the defendant said to Broussard, "I will knock you down like I would anybody else" and that Broussard responded by stepping back, placing his hands on his hips and saying, "Well, knock me down." Burgo further testified that the defendant then pulled out his handcuffs, then drew his gun and shot the deceased. On cross-examination the witness stated that there was loud music playing in the lounge and he was not certain of the words spoken to Broussard by Morgan prior to the shooting.

Robert Taylor testified that he was a patron in the bar at the time of the shooting; that he did not hear any of the conversation between Morgan and Broussard; and that he saw the defendant pull his handcuffs out prior to shooting the deceased.

Prosecution witness John Collins testified that prior to the shooting the defendant said to the deceased, "Shut up" and the deceased responded, "You don't tell me to shut up." He further testified that he heard no other conversation before the shot was fired and that he moved to leave the area when the defendant drew his gun.

Romeo C. McDonald, the first police officer to arrive at the scene, testified that the defendant made a statement at the police station in the presence of himself and other police officers in which he gave the following version of the events leading up to the shooting. (At trial it was stipulated that proper Miranda warnings were

given.) The deceased asked the defendant to eject certain patrons who were not ordering drinks. The defendant then went to the booth where the patrons were located and, upon returning to his post near the front door passed the deceased and told him to leave the customers alone as he, the defendant, would take care of them. The witness further testified that the defendant also told police officers that the deceased then dropped a tray of glasses which he had been carrying and began to curse the defendant; and that the defendant attempted to arrest the deceased, then drew his gun and fired.

Odies Morgan took the stand on his own behalf and testified as follows. On the evening prior to that of the shooting the deceased became involved in an altercation with a patron. The defendant intervened by holding the deceased and pulling him off the patron, who then fled. Immediately following the incident the deceased informed the defendant that the patron had cut him while the defendant was holding him and stated, "I got cut tonight but when I come back on tomorrow night I'll be straight." The defendant then explained deceased meant that he would bring something and he said, "Don't bring anything, Al. I can handle the people. You leave them alone." On the night of the shooting the deceased told the defendant that there were some people in a rear booth who were not ordering drinks and that defendant should have them place an order or eject them. Defendant then went to the rear booth and the occupants thereof complained to defendant about Broussard's conduct toward them and left. The defendant then started back toward his station near the front door and when he passed the deceased he told him to leave the customers alone, that he (defendant) would handle them. Again defendant proceeded toward his station and Broussard followed cursing him and telling him that he was lucky to be allowed to work there and that he gave orders to

424

defendant, defendant did not give orders to him. Finally, after defendant had reached his station near the door, Broussard went over to the bar and set down a tray of drinks that he had been carrying. He then came back toward the defendant saying, "I have a gun just like you have, and you don't tell me nothing to do." The defendant then attempted to arrest Broussard for possession of the gun which he had stated he had, pulling out his handcuffs and stating to Broussard that he was under arrest. The deceased then jumped back and struggled to remove something from his right front pocket. The defendant shouted for him to stop and when he did not the defendant, fearing that Broussard was after the gun which he had announced was in his possession and that it would be used against him, drew his own gun and fired.

Finally, the defendant testified that a .38 caliber revolver, which was used by another employee to help him stand guard while the night's receipts were counted, was kept behind the bar; that he refused to make a formal statement to the police, but agreed to tell them what had happened; and that his narration to the police following the shooting was the same as his testimony.

John Belmonte, a coroner's physician who examined the body of the deceased, testified on cross-examination that given the respective heights of defendant and Broussard, the distance between them, and the path of the bullet as it traveled through Broussard's body, it was his opinion that the deceased was in a crouched position at the time the fatal shot was fired.

The defendant also produced character witnesses who testified to his good reputation and peaceful, law-abiding nature. Certain of these witnesses testified that establishments in which he had served as a security guard had asked that he be reassigned to them because of his ability to handle people.

Ill Rev Stats, c 38, § 9–2 defines the offense of voluntary manslaughter:

(a) A person who kills an individual without lawful justification commits voluntary manslaughter if at the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by:

(1) The individual killed, or

(2) Another whom the offender endeavors to kill, but he negligently or accidently causes the death of the individual killed.

Serious provocation is conduct sufficient to excite an intense passion in a reasonable person.

(b) A person who intentionally or knowingly kills an individual commits voluntary manslaughter if at the time of the killing he believes the circumstances to be such that, if they existed, would justify or exonerate the killing under the principles stated in Article 7 of this Code, but his belief is unreasonable.

■ Section (a) of the statute is not applicable in this case since there is no evidence of provocation or passion. The conversation between Morgan and Broussard will not suffice to fulfill the element of provocation since words alone are not sufficient to constitute provocation. (People v. Crews, 38 Ill2d 331, 231 NE2d 451 (1967); People v. Washington, 27 Ill2d 104, 187 NE2d 739 (1963); People v. Lopez, 93 Ill App2d 426, 235 NE2d 652 (1968)).

■ The contention of the defendant that the finding of guilty of voluntary manslaughter where he had introduced evidence of self-defense constitutes a compromise is untenable. This argument assumes that whenever a person believes that deadly force is necessary to protect himself from death or great bodily harm his be-

426

lief must be reasonable. If that proposition were correct a factual situation could not arise where section (b) of the statute would be applicable.

In finding the defendant guilty of voluntary manslaughter rather than guilty or not guilty of murder as charged in the indictment, the trial judge must have found that defendant believed that the killing of Broussard would be justified or exonerated by the danger to his own person, but that this belief was unreasonable. In the argument supporting his contention that he was not proven guilty beyond a reasonable doubt the defendant has not challenged the sufficiency of the evidence with respect to the killing of Broussard or his mental state, i. e., that the killing was knowingly or intentionally accomplished. Therefore, the reasonable doubt issue is reduced to the question of whether defendant's belief that deadly force was necessary to protect himself from death or great bodily harm was reasonable.

Whether such a belief is reasonable must necessarily depend upon the facts and circumstances surrounding its formulation. Here the defendant and deceased were involved in an incident on the night before the homicide. The following evening another dispute arose during the course of which Broussard informed the defendant that he had a gun. Thereafter, the defendant attempted to arrest Broussard for possession of the firearm which he had declared to have, and Broussard stepped back and placed his hand near or in his pocket. To hold that under the circumstances present in this case one could not reasonably believe that deadly force is necessary to protect against death or great bodily harm would approach elimination of the protection which Article 7 of the Criminal Code bestows. The defendant's version of the circumstances and events surrounding the shooting is substantially unimpaired by the testimony of the occurrence witnesses. Two witnesses testified with respect to the last portion of the conversation had between de-

fendant and Broussard prior to the shooting, that being the only part which was audible to bystanders over the music and general background noise in the lounge. Their respective versions of what was said are incompatible. Further, the defendant's testimony that he first attempted to arrest Broussard is corroborated by occurrence witnesses Burgo and Taylor who testified that they saw defendant pull his handcuffs prior to the shooting.

■ Under these circumstances we are not prepared to say that defendant's belief that the use of deadly force to protect himself from death or great bodily harm was unreasonable. The judgment of conviction is reversed.

Judgment reversed.

BURKE and McCORMICK, JJ., concur.