THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* GUY GIOVANETTI, Defendant-Appellant.

First District (2nd Division)   No. 78-354

Opinion filed March 27, 1979.

Ralph Ruebner and Daniel Cummings, both of State Appellate Defender's Office, of Chicago (Rothschild, Barry & Myers, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger, Francis X. Speh, Jr., and Armand L. Andry, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE HARTMAN delivered the opinion of the court:

Defendant appeals from his jury conviction of voluntary manslaughter arising out of events occurring during an early morning imbroglio on June 21, 1975, at the intersection of Ogden Avenue and Rose Street in the Village of Lyons. He was sentenced to a prison term of from three to twelve years.

Defendant raises eight issues in this appeal: whether police improperly placed him in lineup without the presence of his counsel after he had been formally charged; whether it was error to tender to the jury a non-IPI instruction which did not correctly state the law; whether defendant could have caused the victim's death in the light of testimony indicating that death resulted from a skull fracture with no evidence that defendant hit the victim in the head; whether the State proved beyond a reasonable doubt that defendant attacked the victim; whether the State proved beyond a reasonable doubt that defendant's use of force in self-defense was unreasonable; whether it was error to exclude certain relevant defense evidence; whether it was error to sustain an objection to a defense question because the court and opposing counsel did not understand the medical terminology; and whether the State's failure to comply with a discovery order constituted reversible error. For the reasons set forth below, we affirm.

From the record it appears that a street brawl developed at the

intersection between a discotheque, the Red Anchor Inn (hereinafter "Inn"), and the Chalet Motel (hereinafter "Motel"). Thirty or more people were milling about in this area and were engaged in the battle directly or were onlookers. Among those involved in the altercation were William Hornick, who had been a patron at the Inn, and who died several hours after the fight from injuries he sustained, and defendant Guy Giovannetti,[1] an employee of the Inn, variously described as a "doorman" and "bouncer". Police were called and conducted an investigation, thereafter filing a complaint charging Giovannetti with Hornick's murder. Defendant was arrested that same day.

On June 22, 1975 a lineup was held consisting of seven white males, including defendant, five with mustaches, all of defendant's approximate age and build. Giovannetti himself was 6′3″ tall, weighed 310 pounds and wore a mustache at the time of his arrest. One participant had "sandy" colored hair; defendant has red hair.

Giovannetti arrived at the police station for the lineup in handcuffs, but was not seen by the witnesses prior to the lineup. Three eyewitnesses attended: Jerry Meeks and George Talley, who had been patrons of the Inn along with the decedent during the events leading to his death, and Leonard Barido, a night clerk at the Motel, who had observed the battle. The three eyewitnesses were placed in a room together with no police officers present and defendant was kept in a separate room away from where he could be seen by the witnesses.

Talley was the first witness to view the lineup; he identified defendant as having attacked the deceased. Meeks was the second witness; he identified defendant as the assailant. Barido indicated that he could not positively identify the assailant by face but that defendant fit his impression of the physical build of the assailant. The investigating police officer, Sergeant Frank Krall, testified that no photographs of defendant were shown to any of the witnesses before the lineup, that they were not told to identify the defendant, nor were they told in which position defendant would be. The lineup identifications were corroborated by photographic identification provided by a fourth witness, Earl Boswell, a week after the lineup took place. Color photographs were taken of the individuals who participated in the lineup.

On March 10, 1977, a hearing on defendant's motion to suppress the identification resulting from the lineup was held. Sergeant Krall testified to the above-described events, corroborated by the testimony of Officer John Pankow, who aided in the conduct of the lineup, as well as by the testimony of Talley, Meeks, Barido and Boswell. Each eyewitness

---

[1] Although the caption of this case indicates that defendant's name is spelled Giovanetti, the transcript of defendant's testimony reveals that it is correctly spelled Giovannetti, which we will hereinafter utilize.

testified that defendant was not identified as the suspect prior to the lineup and that they were not asked to select defendant as the assailant. Defendant's motion alleged, *inter alia,* that Giovannetti had been denied his right to counsel during the lineup and that other persons participating in the lineup did not have an appearance similar to his own. Following argument, the trial court denied the motion to suppress, holding that notwithstanding the absence of an attorney there was no showing that the police did anything in any way to suggest to the witnesses the identity of anyone or who they wanted. The court also held that the photographic identification by Boswell complied with constitutional strictures and denied the motion to suppress his identification as well.

The case went to trial on March 16, 1977. The record is replete with extensive and often contradictory testimony. The events shown by the testimony revealed that Hornick, the deceased, drove to the Inn together with a friend, Timothy Filips, at about 1 a.m. on June 21, 1975, after they had been previously drinking together for several hours. They met Meeks, Talley and Boswell at the Inn. Because the bar was crowded they were unable to find seats and stood near the bar. An argument ensued between the group and defendant over the group's obstruction of the waitresses' service area at the end of the bar. This argument developed into a personal confrontation between defendant and decedent. At about 4 a.m., Filips was involved in an argument over closing time with someone else and he was knocked down and removed bodily from the Inn to the outdoors where he was kicked and beaten by one of the bouncers other than defendant.

Meeks, Talley, Boswell and Hornick joined Filips outside and the group walked away from the Inn toward the Motel. As the group reached the parking lot of the Motel they were attacked by a second group of men who followed them there. Pieces of 2″ x 4″ wood were used as clubs in the fight. Defendant's actions were described by various witnesses as follows. Meeks saw Hornick lying in the street on his back, immobile and holding no weapon. He saw defendant run up to Hornick, jump in the air and land with both knees on Hornick's chest and stomach. Meeks and Talley approached defendant and told him to get off the decedent, whereupon defendant responded, "go to hell, you are lucky it's not you." Talley saw Hornick either being picked up and dropped, or else thrown to the ground by someone. Thereafter he saw defendant jump up in the air and come down with both knees on Hornick's midsection and thereafter sat on Hornick. Boswell saw Hornick lying face up on the ground after the fighting had stopped, observed defendant jump in the air twice and come down on Hornick's stomach with his knees on each occasion. Boswell admitted to being kind of "hazy or dizzy" at the time from a beating administered to him but stated that he "knew enough" and

had "seen enough" to support his testimony. Barido testified that the area was excellently illuminated. From the Motel window he saw a man, slightly built, lying motionless on the ground without a weapon. He then saw defendant jump twice upon the midsection of this man, the decedent. An off-duty Chicago police officer, Robert Thomas, came upon the well-lighted scene while driving his auto at approximately 3:55 a.m. After encountering a disorderly crowd of 30 to 50 people in the street he saw defendant throw a man onto the ground, kick him, jump onto his midsection and, as he did so, let out a loud yell. No one was helping defendant; neither defendant nor decedent had any weapons. Thomas thereafter saw defendant drag decedent on the ground across the street by his belt. Filips testified that he was beaten inside the Inn and was thrown out bodily when he engaged in a dispute with someone over closing time. He walked with the group outside toward the intersection and was struck on the head and rendered unconscious. When he revived, Talley told him to run, which he did, lost consciousness again, and awoke one block away after daybreak.

Hornick was put into a green automobile when a police car arrived driven by Sergeant Krall. Krall testified that a man and woman inside the green auto told him that they were taking the injured man to the hospital. Krall examined Hornick briefly and found him battered about the face, moaning and moving his arms and legs about. He was unable to answer questions intelligibly, but did not look that badly injured to Krall. Rather than remove him, Krall ordered the driver of the green station wagon to take him to the hospital. Hornick apparently died some time before 8 a.m. at the LaGrange Community Hospital.

Dr. Joseph Claparols performed the autopsy on the body of the decedent that day. External examination revealed a blackened right eye, a small laceration of the right eyebrow, abrasions on the right forehead area going into the scalp region approximately three or four inches long and one inch wide, abrasions of the right cheek and on the left side of the face and on the neck. There was an abrasion on the left side of the chest and bruises on the back and in the pelvic area. Internal examination disclosed hemorrhages in the chest area, extensive hemorrhaging of the scalp and back of the head, contusion of the brain, two fractures of the skull and a fractured right cheek. Decedent's lungs had hemorrhaged and had sustained bruises and contusions. Rib fractures on the left side included the second, third, fourth, fifth, sixth and seventh ribs and also the second rib on the right side with hemorrhage areas on the inside surfaces and between the ribs. There was a severance of the left lobe of the liver from the right lobe, which resulted in a complete separation, except at the top near the diaphragm. A severe blow would be necessary to cause the liver laceration, but after it was damaged, cardiac resuscitation might

cause additional damage. Dr. Claparols' medical opinion was that the cause of death of the victim was cranio-cerebral injury with skull fracture associated with liver laceration. On cross-examination he testified that the protocol subscribed by him after the autopsy read that the cause of death was "massive laceration of liver in association with cranio-cerebral injury with skull fracture."

The manager of the Inn, Samuel Mottlow, testified for the defense. After the fighting inside the Inn had been moved outside, he went out and told everyone to go home and then re-entered the bar. When he went back outside some time later he did not know what happened, but there were bodies all over. Richard Girdler, a customer at the time of the altercation, testified for the defense. He saw four or five men enter the Inn and sit down. They started an argument and began fighting, which defendant and two other bouncers attempted to stop. They were asked to leave but they refused and had to be escorted out. After being put out of the bar, Hornick and his companions turned back and said "we will get back at you and everybody for kicking us out of the Red Anchor." Girdler went out also to see what was happening. He saw decedent attack Giovannetti with a 2″ x 4″ while defendant was going away from the fight; defendant took the 2″ x 4″ from decedent, threw it away and just pushed decedent, who then grabbed defendant's legs and pulled him down, defendant falling forward and decedent behind him. He then left the scene to take an injured friend to the hospital.

James Paleczny, a customer at the Inn, saw the fight going on in the middle of the street involving 25 men armed with 2″ x 4″s, stop-signs, crowbars and tire irons. He stood outside next to defendant and another man. Defendant was simply standing with his arms folded watching the fight when someone swung a tire iron at him. He did not know what happened between defendant and his attacker because he didn't keep an eye on them, walking away while they were still fighting. He did not see Giovannetti when the latter left the site. Don Rammon, an employee serving as doorman for the Inn, was one of a group of men helping to remove some people from inside the tavern that had been causing trouble. During the course of their removal, kicks and punches were exchanged and some people fell to the ground. He did not see the altercation outside involving decedent. Joseph Sollitt, a customer of the Inn, was outside and observed the beginnings of the fight. He was attempting to aid one of the combatants who had been struck by a 2″ x 4″ when defendant came by, grabbed his arm and said, "come on, let's get the hell out of here, we don't need this." His attention was never drawn to Giovannetti before that. Kenneth Pierson was a patron of the disco. He went outside and saw someone coming at defendant, who sidestepped

and threw the former to the ground; they both then fell down. In an earlier statement given to police, Pierson testified that defendant threw his weight upon the man on the ground, over his chest. Dennis Kraska, a disc jockey at the Inn, but sitting as a patron in the establishment at the time of the incident in question, was outside where he observed defendant and decedent making bodily contact with each other and go down. After watching Giovannetti starting to get up, his attention was diverted; he later saw defendant walking away. He observed another individual, one Steve Messina, grab Hornick by the belt and part of his shirt and drag him out of the street where he had been lying after the fight, dropping him down on a telephone pole which had been lying on the ground. On cross-examination Kvaska testified that he did not know what occurred between defendant and the decedent while they were both on the ground.

Dr. Charles R. Rimpla, a member of the medical staff at LaGrange Community Hospital testified that he treated decedent William Hornick in the emergency room at about 4:10 a.m. He had no independent recollection of the decedent's mode of arrival at the hospital, but a copy of the emergency room record stated "walk," although he was not in the emergency room until five minutes after decedent's arrival. Decedent was unable to give him a history but revealed his name and birthdate. He was delirious and was "moving about very anxious." The emergency room record showed that Hornick sustained a cardiac arrest at 5:55 a.m. and was given cardiac shock consisting of applying two paddles causing electric current to go through the heart. Cardiac massage was also utilized. Rimpla, the nurse, a medical technician and other hospital personnel participated in administering the cardiac massage. This massage consists of applying pressure directly over the lower portion of the sternum under which the liver is situated. This procedure could have an effect upon the liver. At the time Rimpla first saw the decedent, he was of the opinion that he was in a very serious condition. Rimpla noticed two kinds of injuries at the time, one to the head area and the other to the lower left chest and upper abdomen left.

Dr. Steven Medgyesey testified for defendant. In answer to a hypothetical question, it was his opinion that one who had sustained injuries resulting in a massive laceration and partial evulsion of the liver could survive for a period of time less than an hour; probably minutes. Further testifying on a hypothetical basis, it was his opinion that resuscitation efforts could have considerably increased the size of a much smaller liver injury. Once the capsule of the liver is torn, even a mild injury could result in an extension of the tear and further hemorrhage. On cross-examination, he testified that a 250- to 300-pound man who had

jumped up in the air and come down upon a body with his full weight in the area of the chest, lower chest and upper abdomen could have caused the laceration of the liver.

Defendant Guy Giovannetti testified that a fight broke out between Hornick, his companions and some of the personnel of the Inn, resulting in the removal from the bar of the decedent and his party. The Inn was closed sometime thereafter when a customer returned and advised that "they" were waiting for the owner and manager outside and were going to kill him. Defendant and other employees paid no attention, but continued to clean up. Thereafter defendant went outside and noticed a commotion down the street where men were fighting and striking others with metal barricades and 2″ x 4″s. As he watched the fight continuing he saw one of their patrons become endangered and headed toward the fight. Upon hearing a warning, "Guy, look out," he turned to his right and saw Hornick coming at him with a 2″ x 4″ stake, swinging it. He grabbed his shoulder, pulled him to his right, while decedent held him around the stomach. The two fell to the ground, defendant attempting to push decedent behind and away from him. Another man, Steve Messina, then grabbed Hornick by the belt and was picking him up; decedent fought back and was being kicked in the face and in the chest by Messina as he was being dragged across the street. Defendant thereafter got up and left the scene, returning to the Inn to clean himself up.

The jury found Guy Giovannetti guilty of the voluntary manslaughter of William Hornick, having rejected murder as an alternative.

## I.

The first argument for the defense is that Giovannetti was denied due process in his having been placed in a lineup without the presence of counsel and that the defense motion to suppress his identification should have been allowed. The law is clear that with the filing of the complaint charging Giovannetti with murder, defendant was entitled to counsel, a point which the State concedes, pursuant to *Kirby v. Illinois* (1972), 406 U.S. 682, 32 L. Ed. 2d 411, 92 S. Ct. 1877, and *People v. Burbank* (1972), 53 Ill. 2d 261, 291 N.E.2d 161.

■■■ The error in failing to provide counsel to defendant at the lineup in the instant case, however, does not necessarily vitiate the subsequent identification or the conviction. A similar contention was made and overruled in *People v. Marshall* (1977), 47 Ill. App. 3d 784, 365 N.E.2d 367, and in *People v. Shorter* (1978), 59 Ill. App. 3d 468, 477-78, 375 N.E.2d 513, wherein the courts held that the absence of counsel at the lineup was error but did not require reversal. In *Marshall* the court stated (47 Ill. App. 3d 784, 786):

"It is well established that the requirement of counsel's presence is

based upon consideration of due process and that if all the circumstances surrounding the identification procedure taken together clearly indicate that due process was followed, the absence of counsel at the identification lineup is not fatal to the judgment reached by the trial court."

To the same effect are *People v. Hinton* (1974), 23 Ill. App. 3d 369, 319 N.E.2d 313, and *People v. McDonald* (1974), 23 Ill. App. 3d 86, *aff'd* (1976), 62 Ill. 2d 448, cases upon which defendant also relies.

The testimony concerning the identifications made at the lineup in the absence of a defense attorney is subject to the *per se* exclusionary rule promulgated by *Gilbert v. California* (1967), 388 U.S. 263, 273, 18 L. Ed. 2d 1178, 1186-87, 87 S. Ct. 1951; however, evidence was adduced during the course of testimony by witnesses at the pretrial hearing on defendant's motion to suppress the identifications and also during the course of the trial from which it appears that sources independent of the lineup existed from which identification emanated. The testimony of Talley and Meeks at the pretrial hearing and at the trial itself demonstrates that they had ample opportunity to see defendant before, during defendant's attack on decedent, and after the street altercation, having accompanied decedent during those periods of time. Barido, the Motel night clerk, testified at the pretrial hearing and at the trial to circumstances showing that he had ample opportunity to view defendant at the scene so as to enable him to state that Giovannetti possessed the same physical characteristics as the man he had seen attack decedent although he could not positively identify his face. Boswell testified at each hearing that he, too, had been with decedent while they were patrons at the Inn, when they left and during the fight, and that when shown photographs of the individuals participating in the lineup, which he was unable to attend, he had identified defendant's photograph as the man he had seen attacking the decedent. At the trial, Officer Thomas identified defendant in court as Hornick's assailant, having witnessed defendant throw decedent to the ground, kick him, land with both knees on his chest and broad jump onto his midsection. The in-court identifications of defendant were based upon origins independent of the lineup and, therefore, the absence of defense counsel at the lineup does not require reversal on appeal. *Gilbert v. California* (1967), 388 U.S. 263, 18 L. Ed. 2d 1178, 87 S. Ct. 1951; *Chapman v. California* (1967), 386 U.S. 18, 24, 17 L. Ed. 2d 705, 710, 87 S. Ct. 824; *People v. McDonald* (1975), 62 Ill. 2d 448, 453-54, 343 N.E.2d 489.

## II.

■ Defendant next contends that the conviction should be reversed because the trial court tendered to the jury a non-IPI instruction

concerning the legal cause of the victim's death. The instruction, numbered 7.01, was offered by the State and read as follows:

"You are instructed that where a person inflicts upon another an injury which is dangerous, that is calculated to endanger or destroy life, it is no defense to a charge of murder or manslaughter:

That the acts of the defendant were not the sole and immediate cause of death of the victim, or

That the victim did not die immediately."

Defendant correctly asserts that the language of the foregoing instruction is quite similar to that criticized in *People v. Dordies* (1978), 60 Ill. App. 3d 621, 377 N.E.2d 245. In *Dordies*, the court found that the non-IPI instruction referred to was defective because it ignored the possibility of a supervening act that might relieve defendant of responsibility for his actions in regard to a deceased victim. The existence of a sufficient cause of death occasioned by an act of the accused is presumed to have resulted from that act unless it appears that death was caused by a supervening, disconnected act. *People v. Dordies* (1978), 60 Ill. App. 3d 621, 626.

It appears that the instruction given in the instant case was an attempt to comply with the holding of *Dordies*; however, it also ignores the possibility of a supervening cause of death as did the instruction given in *Dordies*. No direct evidence was presented in the instant case with respect to the existence of a supervening cause, however. Defendant's objections to the use of the instruction are generalized assertions that the persons administering the cardiac massage severed the liver of the decedent and thereby started a new chain of causation that led directly to the liver laceration. We disagree.

There is ample evidence in the record demonstrating that defendant had jumped upon Hornick's upper abdomen and lower chest at least once and perhaps twice; initial medical examination of decedent before resuscitation efforts revealed injuries to this area of his body. The autopsy revealed extensive hematomas, the liver laceration, six broken ribs on the right side and one on the left. We may assume that the liver injury might have been smaller before the cardiac massage than it was afterward; this assumption, however, does not support defendant's contention that his activities were disconnected from the procedure, even were we to accept the thesis that the cardiac arrest was due primarily to head injuries Hornick sustained. This is true not only because Giovannetti was seen throwing decedent to the ground, and later observed dragging decedent along the pavement, which might well have caused head injuries, but also because the life-saving procedures were required by their nature to be administered in the very region of the victim's body which had already been injured by defendant, thus directly connecting his conduct with this possible cause of death. The original trauma inflicted by defendant

triggered the sequence of events leading to emergency treatment. That treatment, therefore, hardly qualifies as an act disconnecting defendant's conduct from the ultimate demise as an independent intervening cause. See, *e.g.*, *People v. Baer* (1976), 35 Ill. App. 3d 391, 395, 342 N.E.2d 177; *People v. Stamps* (1972), 8 Ill. App. 3d 896, 901-02, 291 N.E.2d 274; *People v. Paulson* (1967), 80 Ill. App. 2d 44, 48-49, 225 N.E.2d 424.

The injuries inflicted by Giovannetti need not have constituted the sole or the immediate cause of death in order for them to have been deemed the legal cause of death. (*People v. Love* (1978), 71 Ill. 2d 74, 84, 373 N.E.2d 1312; *People v. Reader* (1962), 26 Ill. 2d 210, 213, 186 N.E.2d 298.) Nothing in the testimony of the medical witnesses lends credence to defendant's unsupported assertions of negligence or malpractice in the administration of the cardiac resuscitation procedures, or that they were unnecessary. There is no evidence demonstrating that Hornick could have survived without the cardiac massage. The challenged instruction given is an erroneous statement of the law (*People v. Dordies*); however, under the facts and circumstances of this case, its submission to the jury did not constitute reversible error.

### III.

Defendant asserts that he has not been proven guilty beyond reasonable doubt of having caused Hornick's death because there was no evidence that he was responsible for the head injuries; that he did not cause the liver injury from which decedent ultimately died; and that he cannot be held responsible for subsequent maltreatment at the hospital or for any earlier blow which Hornick may have sustained prior to the stomping. We have already considered the evidentiary basis for defendant's contentions in the previous argument and will not repeat that analysis here. We add only that unless the evidence presented to the jury is so improbable, unbelievable or unsatisfactory as to raise a serious question with respect to the guilt of defendant, the determination by the fact finder will not be disturbed on appeal. (*People v. Donald* (1963), 29 Ill. 2d 283, 286-87, 194 N.E.2d 227; *People v. Dillon* (1975), 28 Ill. App. 3d 11, 20-21, 327 N.E.2d 225; *People v. Owens* (1977), 46 Ill. App. 3d 978, 988, 361 N.E.2d 644.) The record in this cause requires that the verdict be affirmed on this point.

The issue of reasonable doubt is further pursued by defendant with respect to whether certain inconsistencies in the testimony of the witnesses require reversal. The differences include questions as to how many times defendant jumped on Hornick (once or twice), who dragged Hornick down the street thereafter (defendant or someone else), and Hornick's whereabouts after the attack. It is apparent that even if decedent was stomped on twice by defendant, some witnesses may only

have seen one of the jumps. It was amply shown that defendant did indeed jump upon decedent's body, particularly in the area of the upper abdomen; whether once or twice is not controlling. With respect to who dragged decedent on the ground after the stomping, whether defendant jumped or fell on the decedent and whether the State's witnesses were able to observe the conduct about which they testified, their credibility and their bias were all matters brought to the attention of the jury. The jury's determination that Giovannetti was responsible for the death of Hornick was legally permissible and sufficiently justified by credible evidence so as to support their finding of guilt beyond a reasonable doubt.

## IV.

The defense urges that Giovannetti's conviction for voluntary manslaughter be reversed because his belief was not unreasonable that his actions were justifiable as self-defense. He argues that circumstances revealed a massive street brawl in progress; that Hornick approached Giovannetti in the midst of that fight, that none of the State's witnesses saw this approach, but merely saw him already on the ground; but that defense witnesses testified to having seen Hornick wielding a piece of 2″ x 4″ as he came toward defendant. Giovannetti's belief that Hornick was an imminent danger to his life was reasonable, it is contended, because of the many injuries sustained by others through the instrumentalities of 2″ x 4″s and pipes, and that his only choice was to use his body to end Hornick's attack. Defendant relies upon three cases in which the court reversed convictions of defendants on the bases of facts indicative of permissible actions of self-defense (*People v. Brown* (1966), 78 Ill. App. 2d 327, 223 N.E.2d 311; *People v. Morgan* (1969), 114 Ill. App. 2d 421, 252 N.E.2d 730 and *People v. Taylor* (1972), 3 Ill. App. 3d 734, 279 N.E.2d 143). In each of the above-cited cases, however, the defendant was faced with an assailant wielding a deadly weapon within an enclosed area at the moment of retaliation. In contradistinction to those situations, defense witnesses testified that Giovannetti disarmed Hornick and the State's witnesses testified that the jumping took place upon an unarmed man, already lying prostrate on the ground, whose physical makeup was much smaller than his attacker's. The court tendered to the jury IPI Criminal instruction No. 24.06 in which the jury was told, in part, that "a person is justified in the use of force when and to the extent that he reasonably believes such force is necessary to defend himself against the imminent use of unlawful force." From the aforecited facts, the jury could well have disbelieved that at the time of defendant's attack the unarmed, prostrate decedent possessed any capacity for "imminent use of unlawful force" against defendant and that it was unreasonable for him to believe that he

did. The opinion of the supreme court in *People v. Jordan* (1960), 18 Ill. 2d 489, 492-93, 165 N.E.2d 296, is instructive in this regard:

> "Whether a killing is justified under the law of self-defense is always a question of fact to be determined by the jury under proper instructions. (*People v. Maurantonio*, 8 Ill. 2d 60, 64.) Once a jury has decided this question and has reached a verdict this court will not disturb that finding unless the evidence is palpably contrary to the verdict or so unreasonable, improbable or unsatisfactory that it justifies entertaining a reasonable doubt of the defendant's guilt. *People v. Johnson*, 2 Ill. 2d 165, 172; *People v. McClain*, 410 Ill. 280."

To the same effect are *People v. Bland* (1978), 58 Ill. App. 3d 369, 374 N.E.2d 710, and *People v. Davis* (1975), 33 Ill. App. 3d 105, 337 N.E.2d 356. We decline to set aside the jury's finding with respect to this defense.

## V.

Defendant assigns error in the exclusion by the trial court of a doctor's testimony concerning decedent's medical history when he first entered LaGrange Community Hospital for treatment. The defense sought to elicit from Dr. Charles Rimpla testimony to the effect that the nurse or secretary on duty noted in her record Hornick's coherence and calmness before the medical treatment was commenced and his statements as to the cause of his injuries, which were potentially exculpatory. Defendant admits that if intended to prove the facts contained in this history, Dr. Rimpla's testimony would be hearsay, but asserts that it is nevertheless admissible as an exception to the hearsay rule, relying on *People v. Gant* (1974), 58 Ill. 2d 178, 317 N.E.2d 564. That case is inapposite, however, since in *Gant* the doctor in the emergency room took the history of a patient himself. He was permitted to testify with respect to the patient's responses to his questions, which he recorded.

Giovannetti did not offer testimony from any person concerning the preparation or reliability of the instant report, unlike *People v. Gant*. Here, no opportunity existed for examination of the person who was responsible for preparation of the notes to ascertain the circumstances under which the information was taken, the content of the notes with respect to accuracy, whether the notes transcribed by the person filling in the report were made as the result of a direct conversation with the decedent, or with someone else. No reason has been given as to why the person responsible for preparation of the notes was not or could not have been present at the trial of the case.

Defendant's reliance upon the business records exception to the

hearsay rule (Ill. Rev. Stat. 1975, ch. 110A, par. 236; ch. 38, par. 115—5(c)(1)) for admissibility of the hospital records is equally misplaced, inasmuch as both the Supreme Court Rules and the Code of Criminal Law and Procedure specifically exclude medical records from introduction in evidence as business records.

■■ A similar claim of error was made and rejected in *People v. Aristole* (1971), 131 Ill. App. 2d 175, 268 N.E.2d 227, because the physician through whom the defendant in that case sought to elicit the medical history was not involved in its preparation. Further, in *Slater v. Missionary Sisters of Sacred Heart* (1974), 20 Ill. App. 3d 464, 314 N.E.2d 715, it was held that hospital records are not admissible without the testimony of the persons who made the entries which comprise the medical records, and in *LeMaster v. Chicago Rock Island & Pacific R.R. Co.* (1976), 35 Ill. App. 3d 1001, 343 N.E.2d 65, the court held that a hospital record was admissible only if those persons who made entries in it testify to their correctness, even where the witness was the treating physician who had read the history and made one of the entries therein.

■■ Defendant also seeks support for his position from *People v. Walton* (1976), 43 Ill. App. 3d 74, 356 N.E.2d 1131, *People v. Jackson* (1968), 41 Ill. 2d 102, 242 N.E.2d 160, and *Wright v. Upson* (1922), 303 Ill. 120, 135 N.E.2d 209. In *People v. Walton,* no objection to the testimony of the treating physician as to the medical records was made and, as in *Gant,* the witness was the doctor who treated the victim in any event. In *People v. Jackson,* a jail inmate admittance card was received in evidence, which contained a notation that defendant's condition was good, as well as his nonmedical history, picture, finger prints and reason for admission, pursuant to statutory requirement. The supreme court noted that the defendant's inmate history card was considerably more than the diagnostic medical record intended to be excluded without doctor identification by the Supreme Court Rule. The court also observed that the medical portion was merely descriptive of the prisoner's appearance. (41 Ill. 2d 102, 114-15.) In *Wright v. Upson,* the supreme court held that admission of the medical record in that case was error because only one of the two nurses who made the entries was called to testify as to their correctness and there was no showing that the other nurse or nurses were deceased or out of the jurisdiction (303 Ill. 120, 144). Under the authorities cited by defendant, the exclusion of the medical records in the instant case was not error.

Two wooden stakes, which were 2″ x 4″s, three feet in length, with one sharpened end, were presented as defense exhibits four and five and were identified by defendant and defense witnesses as "similar" to the clubs wielded by combatants in the brawl. The defense also presented an

18″ metal pipe as defense exhibit six which a witness identified as "similar" to a pipe he saw a man hold in his hand as he wandered through the brawl. The stakes and pipe were recovered from the scene by Sergeant Krall, having been found by him lying on the ground. The trial judge refused to receive those exhibits in evidence, a ruling which defendant claims was to his prejudice. Defendant argues that since there was no way of identifying which of the many stakes and pipes at the construction site were used in the brawl, they were the best physical evidence available for use at the trial, relying upon *People v. Miller* (1968), 40 Ill. 2d 154, 238 N.E.2d 407.

The jury observed the proposed exhibits during the course of examination of certain witnesses notwithstanding the fact that they were not subsequently admitted in evidence. The evidence demonstrates that defendant had already disarmed Hornick so that the stakes were never involved in the commission of the crime. (*People v. Miller* (1968), 40 Ill. 2d 154, 159.) Those who witnessed the jumping confirmed that Hornick held nothing in his hands at that time. Under these circumstances, we fail to see how the refusal of admittance of these objects, even as demonstrative evidence, could have been prejudicial to defendant. The use of demonstrative evidence is discretionary with the trial court; we cannot say that the trial judge abused his discretion in the exclusion of these proposed exhibits. *Smith v. Ohio Oil Co.* (1956), 10 Ill. App. 2d 67, 76-77, 134 N.E.2d 526.

## VI.

While cross-examining Dr. Joseph Claparols, who had performed the autopsy, defense counsel asked a question intended to demonstrate that Hornick's death could have been due to factors not linked to defendant. The following are excerpts of an exchange which took place in this regard:

> "Q. Now with respect to severe trauma again applied through the xyphoid process, isn't it true that the extent of this trauma applied to the lower sternum and the xyphoid was mediated through an unstable chest wall caused by the fracture of the 7th rib of the left rib cage?
>
> MR. AGRAN: I will object. I don't understand that.
> * * *
>
> THE COURT: I don't understand it either.
> * * *
>
> THE COURT: Why don't you take out the elements of the question and ask them separately? Then there won't be any chance of misunderstanding or miscomprehension.

MR. BUONAFEDE: Judge, it will always be a medical question.

THE COURT: It's not incomprehensible because it's a medical question. I am not going to answer it. I have ruled."

It is defendant's contention that the trial court's ruling was improper and prejudicial because the proposed question sought to show that "* * * force applied during the attempted cardiac resuscitation could have been transferred to the xyphora [*sic*], which was floating free on top of the liver because of Hornick's fractured rib." By excluding the question, defendant states, the doctor was not allowed to testify as to whether the cardiac resuscitation could have exacerbated the injuries sustained by Hornick when he entered the hospital. Assuming the correctness of defendant's position, the error of exclusion was subsequently cured. The record shows that later in the cross-examination this exchange took place:

"Q. Now, doctor, once the capsule of the liver is torn, can the extension of that tear or further damage to the underlying liver tissue be caused by severe, moderate or mild injury?

A. If the capsule is torn, the liver could have less resistance to injury.

Q. So your answer would be 'yes'?

A. I don't know the amount of force still necessary to produce more injury.

Q. Well, it can create further damage, the extension of that tear? * * *

A. I can't say how much force would be necessary to produce further injury on a liver with a capsule torn. All I can say is, it would take less force than otherwise.

Q. Alright. How about the manipulation of cardiac resuscitation? Could that be expected to cause additional damage to a lacerated liver, yes or no?

A. Yes, it is possible."

From the foregoing it is clear that the doctor was asked and affirmatively answered the question as to whether cardiac resuscitation could have exacerbated Hornick's injury. The defense inferentially accepted the trial judge's suggestion that the question which is the object of this point be rephrased. The point defendant sought to make was made, and the exclusion of the potentially confusing original question was, therefore, not prejudicial to defendant's case.

## VII.

Defendant claims that the State failed to tender to him a written record of a certain oral statement made by Officer Robert Thomas, the off-duty Chicago policeman and witness, to Charles Hartman, an off-duty assistant state's attorney who had been assigned to an earlier stage of the

case. The demand was made pursuant to Rule 412(a)(i) of the Illinois Supreme Court (Ill. Rev. Stat. 1975, ch. 110A, par. 412(a)(i)). The defense motion for discovery sought "a memoranda [*sic*] reporting or summarizing oral statements" of State witnesses. No written memorandum of Thomas' oral statement is alleged by defendant to have been made by the State. He further concedes that no authority exists which has interpreted the rule as requiring the State to reduce to writing and make a record of all oral statements of every person questioned in connection with an investigation.

Defendant recognizes the potentially heavy burdens such a requirement would impose, citing *People v. Manley* (1974), 19 Ill. App. 3d 365, 311 N.E.2d 593, and *People v. DeStefano* (1975), 30 Ill. App. 3d 935, 332 N.E.2d 626. *Manley* would allow the defense to obtain memoranda setting forth oral statements made by a defendant which it had requested specifically. In the instant case, Thomas' name had been included in a list of persons that the State might call as witnesses submitted to the defense some ten months prior to trial. The opportunity to have examined this witness and to have ascertained in pretrial proceedings the essence of the informal, oral conversation between Thomas and the assistant state's attorney was thus afforded to defendant at a time when he could have requested such a *Manley* memorandum. That conversation is unlike the admissions which constituted the absent oral statement made by the defendant in *People v. Rand* (1975), 29 Ill. App. 3d 873, 331 N.E.2d 15, and is distinguishable from the special circumstances in *People v. DeStefano*, in which the State deliberately refrained from making memoranda of five different interviews of the same witness, cited by defendant. Defendant's reliance upon *People v. Abbott* (1977), 55 Ill. App. 3d 21, 370 N.E.2d 286, is also unpersuasive. No evidence of bad faith by the State appears in the instant case, as *Abbott* would require. Nevertheless, it is appropriate to repeat here the preceptive language set forth in *Abbott* (55 Ill. App. 3d 21, 25):

> "The prosecution's duty to preserve evidence was well-stated in *United States v. Bryant* (D.C. Cir. 1971), 439 F.2d 642, where the court stated: 'The purpose of the duty is not simply to correct an imbalance of advantage, whereby the prosecution may surprise the defense at trial with new evidence; rather, it is also to make of the trial a search for truth informed by all relevant material, much of which, because of imbalance in investigative resources, will be exclusively in the hands of the Government.' (439 F.2d 642, 648.) One use of such statements and memoranda is to test the witness' credibility at trial. (*People v. DeStefano* (1975), 30 Ill. App. 3d 935, 943, 332 N.E.2d 626.) While we have found that our rules of discovery do not require a prosecutor to reduce all of his witnesses'

pretrial statements to written memoranda and that defense counsel should not rely on the State to prepare a case for the defense, we will not condone intentional tactics taken by the State to preclude discovery of relevant material.

The police and prosecutor are primarily engaged in a quest for truth when they investigate allegations of criminal activity. Any attempt to avoid the disclosure of evidence casts an ominous shadow over our entire system of law enforcement including its investigative, prosecutorial, and judicial branches. On occasion, such tactics might result in the conviction of an innocent man, although we are confident that that did not occur in the instant case. What might have happened here is that prompt disclosure of Sestina's testimony could have resulted in a guilty plea instead of the trial which we are reviewing."

From the foregoing considerations, the verdict of the jury was sufficiently supported by the law and the evidence requiring that defendant's conviction for manslaughter be affirmed.

Affirmed.

STAMOS, P. J., and DOWNING, J., concur.